**Wayne KUBSCH, Appellant (Defendant),**

v.

**STATE of Indiana, Appellee (Plaintiff).**

**No. 71S00–9904–DP–239.**

Supreme Court of Indiana.

March 14, 2003.

☞267

Monica Foster, Rhonda Long–Sharp, Foster & Long–Sharp, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, James B. Martin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, Marshall L. Dayan, Durham, NC, Brief of Amicus Curiae Commission on Social Action of Reform Judaism.

RUCKER, Justice.

### Case Summary

After a trial by jury, Wayne Kubsch was convicted of three counts of murder in the shooting and stabbing deaths of his wife Beth Kubsch, Beth's ex-husband Rick Milewski, and Beth's eleven-year-old son, Aaron Milewski. Following the jury's recommendation, the trial court sentenced Kubsch to death. In this direct appeal Kubsch raises eighteen issues for review, which include whether the trial court erred

in admitting Kubsch's entire videotaped interrogation into evidence. This issue is dispositive. We therefore reverse the trial court's judgment and remand this cause for a new trial. However, because several issues are likely to arise on retrial, we address them as well. Restated the issues are: (1) did the trial court err by allowing into evidence items seized from Kubsch's truck; (2) was inadmissible hearsay allowed into evidence; (3) did the trial court err by allowing opinion testimony into evidence; (4) did the trial court err by allowing certain photographs into evidence; and (5) was Kubsch denied the opportunity to present a meaningful defense.

### Facts and Procedural History

Wayne and Beth Kubsch dated several years before getting married in November 1997. At the time of their marriage, Beth was the mother of two sons from a previous marriage: eleven-year-old Aaron Milewski, and twelve-year-old Anthony Earley. Aaron lived in South Bend with his father Rick Milewski, and Anthony lived with Kubsch and Beth in their Mishawaka home. In addition to the house in Mishawaka, Kubsch owned eleven rental properties throughout St. Joseph County with mortgages totaling over $456,000. By 1998, Kubsch had amassed considerable personal debt. In March 1998, Kubsch refinanced four of his rental properties to pay off credit card debt exceeding $16,000. Despite paying off this debt, by August 1998 Kubsch had accumulated another $23,000 in credit card debt. And by September 1998, Kubsch was falling behind on some of his mortgage payments, and the taxes on his rental properties were so delinquent that he was in danger of losing them in a tax sale.

In the midst of these financial problems, Kubsch purchased a life insurance policy on his wife Beth, and listed himself as the sole beneficiary. The policy was issued July 27, 1998, and paid $575,000 upon the death of the insured.

On September 18, 1998, Beth was scheduled to retrieve Anthony from a school dance at 4:45 p.m. When she failed to show, Anthony received a ride home from a friend. Arriving at the house at approximately 5:30 p.m., Anthony saw the cars of both Beth and Rick parked in the driveway. When he entered the house, however, no one appeared to be home. While searching the house, Anthony noticed blood on the floor in his mother's bedroom as well as signs of a struggle. He then checked the basement, where he found the bodies of Rick and Aaron. Rick had been shot in the head, and a knife was protruding from his chest. A later autopsy revealed that Aaron also had been shot in the head and stabbed twenty-two times. Unable to find the telephone, Anthony ran to the house of a neighbor, who called 911.

When Kubsch arrived home around 6:45 p.m., his house was closed off with crime scene tape. After being told that Rick and Aaron were dead and that his wife's whereabouts were unknown, Kubsch accompanied police to the Special Crimes Unit in South Bend for routine questioning. Michael Samp and Mark Reihl, both detectives with the Special Crimes Unit, videotaped and audio taped the questioning. Although Detective Samp informed Kubsch that he was not under arrest, he nevertheless read Kubsch *Miranda* warnings. Kubsch signed a waiver of rights form and proceeded to answer the detectives' questions concerning his whereabouts that day. Kubsch told police that he had not seen Beth since he left for work around 6:00 a.m. that morning and that he had just returned from Three Rivers, Michigan where he had picked up his son. Eventually Kubsch said, "I don't wanna talk anymore...." R. at 914. When the detectives began asking additional ques-

tions, Kubsch again said, "I don't want to go [talk] anymore" and left the interview room. R. at 914.

Around 9:00 p.m., police discovered Beth's body in the basement. It was hidden in a "fort" that Anthony had built underneath the basement steps. R. at 3359. Beth had been "hog-tied" with duct tape, and her head was encased in duct tape. R. at 3359–60. She had been stabbed eleven times. A pair of sunglasses belonging to Kubsch was lying beside her left knee.

After learning that Beth's body had been found, Detective Samp instructed an officer to bring Kubsch back to the Special Crimes Unit. Detective Samp wanted to ask Kubsch a few more questions, seek permission to search his vehicle, and inform him that his wife was dead. This second round of questioning was also audio taped and videotaped. Upon entering the interview room, Kubsch said "I really don't want to answer anymore . . . questions . . . [b]ecause if I was you . . . I would look at me as a prime suspect and I . . . really don't want to answer any questions." R. at 914–15. Detective Samp then asked Kubsch for permission to search his vehicle, and Kubsch signed a consent form permitting officers to do so. At that point, Detective Reihl asked Kubsch "[w]hat happened at the house?" R. at 917. When Kubsch did not answer, Detective Reihl informed him that Beth was dead. Kubsch's reaction was "[that] was fairly obvious." R. at 917. Detective Reihl then asked Kubsch again what happened at the house, to which Kubsch responded, "I don't want to answer anymore questions." R. at 917. Detective Reihl replied, "Exactly what do you mean when you say you don't want to talk to us?" R. at 917. Kubsch elaborated, "I don't want to talk

without an attorney." R. at 917–18. The questioning was discontinued.

From September to December 1998, no one was arrested or charged in connection with the three deaths. However, on December 18, 1998, a person by the name of Tashana Penn told police that during the first week of December she and her boyfriend were present at a restaurant in Mishawaka. According to Penn, when her boyfriend left the table to go to the restroom, she overheard a conversation between two men who were seated in a booth directly behind her. Penn told police that one of the men said he had hurt a little boy and although he did not like the little boy, he never meant to hurt him. According to Penn, the man also admitted hurting the little boy the most severely and predicted that he would never get caught. Penn later identified Kubsch from a photo array as the man talking in the restaurant.

On December 22, 1998, the State charged Kubsch with three counts of murder. And on April 7, 1999, the State filed its notice of intent to seek the death penalty. The trial was held June 1–15, 2000. The State's theory at trial was that Kubsch's financial difficulties spawned the purchase of the life insurance policy and the plot to kill Beth. The State argued that the murders were committed between 1:53 and 2:51 p.m. primarily based on Kubsch's cellular phone records. The State contended that Kubsch first killed Beth, was surprised by Rick and Aaron's arrival, and then was forced to kill them. The defense theory at trial was that Kubsch was in Michigan picking up his son at the time of the murders and that Brad Hardy, a lifelong friend of Kubsch, committed the murders.[1] In support of its theory, the State presented evidence that Kubsch's cellular

---

1. For his involvement in these crimes, Hardy was charged with assisting a criminal and

conspiracy to commit murder. R. at 4142, 4155.

phone records placed him near his home in Mishawaka, when he claimed to be present in Michigan. The State also presented evidence that duct tape packaging was found during the search of Kubsch's vehicle. And despite Kubsch's claim that he had not seen Beth since 6:00 a.m. on the morning of the crimes, the State presented evidence that a bank receipt stamped 11:13 a.m. on September 18 with Beth's fingerprints on it had also been found during the search of Kubsch's vehicle.

The jury found Kubsch guilty as charged. The penalty phase of trial was held on June 16, 2000, and the jury returned a recommendation of death. Following a sentencing hearing, the trial court imposed the death penalty in a one-page sentencing order dated September 1, 2000. Kubsch appealed to this Court raising eighteen issues, one of which was that the sentencing order was deficient. The State conceded this point, and we remanded this cause to the trial court for a new sentencing order. On January 11, 2002, the trial court issued a new sentencing order once again imposing the death penalty. Kubsch now appeals. In addition to the seventeen issues initially raised, Kubsch also contends that the new sentencing order is again deficient.[2]

## Discussion

### I.

### *Doyle Violation*

During its case in chief, the State played the videotape showing both rounds of Kubsch's questioning. Kubsch objected to those portions of the videotape showing him invoking his right to silence. Overruling the objection, the trial court played the videotape in its entirety. During deliberations, the jury requested to view the videotape again. Over Kubsch's objection, the trial court replayed the entire videotape. Kubsch contends that the trial court erred in admitting those portions of the videotape showing him invoking his right to silence because it violates *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

■ In *Doyle,* the Supreme Court held, "[T]he use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96

---

2. Specifically, Kubsch frames the issues as follows:

(1) whether admission of Kubsch's entire videotaped interrogation violated the U.S. and Indiana Constitutions; (2) whether search of Kubsch's car violated the U.S. and Indiana Constitutions; (3) whether Kubsch's interrogation was custodial and, if so, whether police scrupulously honored his *Miranda* invocation; (4) whether bans on defense evidence, argument and instruction require reversal; (5) whether admission of victim's hearsay statements violated evidence rules and Confrontation Clauses; (6) whether reversal is required because the court failed to inquire into potential conflicts, deprived Kubsch of his right to presence and counsel, and failed to disqualify the prosecutor; (7) whether expert testimony was erroneously admitted; (8) whether exclusion for cause of a prospective juror based solely on religion was unconstitutional; (9) whether reversal is mandated because the prosecutor argued evidence not admitted at trial and used silence as evidence of guilt; (10) whether judicial statements deprived Kubsch of a fair trial; (11) whether the accomplice liability instruction was erroneous; (12) whether the jury was organized to return a verdict of death; (13) whether the court erroneously admitted photographs; (14) whether the Court should enforce *Lowrimore v. State,* (15) whether reversal is mandated because the court failed to consider or submit to jurors Kubsch's good prison adjustment; (16) whether the penalty verdict forms were erroneous; (17) whether the court violated *Apprendi v. N.J.,* (18) whether remand is mandated because the sentencing order is insufficient.
Br. of Appellant at 1–2.

S.Ct. 2240. The Court explained, "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id.* at 618, 96 S.Ct. 2240. "Silence" does not mean only muteness; it includes the statement of a desire to remain silent as well as a desire to remain silent until an attorney has been consulted. *Wainwright v. Greenfield,* 474 U.S. 284, 295 n. 13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Further, *Doyle* is not limited solely to "the use for impeachment purposes" of a defendant's silence. *Id.* at 292, 106 S.Ct. 634. Rather, it also applies to the use of a defendant's silence as affirmative proof in the State's case in chief. *Id.*

■ The State does not seriously dispute that it used Kubsch's silence in the face of *Miranda* warnings as affirmative proof in its case in chief. Rather, the State contends that because Kubsch was not in custody [3] at the time of the questioning, *Doyle* does not apply. Br. of Appellee at 13–14. It is true that *Doyle* refers to the use of a defendant's silence "at the time of arrest." However, the critical holding in *Doyle* was the "implicit assurance contained in the *Miranda* warnings 'that silence will carry no penalty.'" *Wainwright,* 474 U.S. at 290, 106 S.Ct. 634. As the Supreme Court has also declared "*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances." *Anderson v. Charles,* 447 U.S. 404, 407–08, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (citations omitted). It is apparent that a defendant's prearrest, post-*Miranda* silence enjoys the same protection as a defendant's postarrest, post-*Miranda* silence. *See, e.g., Kappos v. Hanks,* 54 F.3d 365, 368–69 (7th Cir.1995) ("[T]he fact that an arrest had not yet occurred does not render *Doyle* inapplicable. Although [the defendant's] comments about his refusal to answer more questions occurred prior to his arrest, they were made *after* he had been given his *Miranda* warnings. It is then that the promise contained in the statement of *Miranda* rights precludes the prosecutor from commenting on the defendant's silence."); *United States v. Rivera,* 944 F.2d 1563, 1568 n. 12 (11th Cir.1991) ("[T]he vital distinction for our purposes ... is not when [the defendant] was arrested or technically in custody, but when she was given her *Miranda* warnings and thereby given the implicit assurance that her silence would not be used against her."). In this case, by using Kubsch's silence in the face of *Miranda* warnings as affirmative proof of his guilt, the State violated the Due Process Clause of the Fourteenth Amendment as articulated in *Doyle.* The trial court thus erred in admitting an unredacted version of the videotape into evidence.

■ Apparently anticipating the foregoing conclusion, the State contends that any error in admitting those portions of the videotape showing Kubsch invoking his right to silence is harmless. A constitutional error may be harmless if it is clear beyond a reasonable doubt that the error did not contribute to the defendant's conviction. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In analyzing whether a *Doyle* violation is harmless beyond a reasonable doubt, this Court examines five factors: (1) the use to which the prosecution puts the post-arrest silence; (2) who elected to pursue the line of questioning; (3) the quantum of other evidence indicative of guilt; (4) the intensi-

---

**3.** See discussion infra Section II.A.

ty and frequency of the reference; and (5) the availability to the trial court of an opportunity to grant a motion for mistrial or give a curative instruction. *Robinette v. State*, 741 N.E.2d 1162, 1165 (Ind.2001).

■ In response to these factors, the State argues that the "few" references to Kubsch's invocation of his right to silence coupled with the independent evidence of his guilt points to the conclusion that the error is harmless beyond a reasonable doubt. Br. of Appellee at 23. We disagree. The use to which the State, in its case in chief, put those portions of the videotape showing Kubsch invoking his right to silence is rather apparent: Kubsch was unwilling to talk with police even though his wife and step-son had just been killed, giving the impression that Kubsch had something to hide or else he would assist in locating their killers. And although the amount of other evidence indicative of Kubsch's guilt as set forth in the "Facts" section of this opinion is sufficient to sustain the convictions, that evidence is circumstantial and was fiercely contested at trial.[4]

Regarding the frequency and intensity of the references to Kubsch's silence, the videotape itself, which was played to the jury twice, showed Kubsch invoking his right to silence six times. In addition, during his opening statement, the prosecutor made the following reference:

Then the defendant said I don't want to talk to you anymore. I don't want to talk to you anymore because if I were you, I would consider me as the prime suspect. The officers urged him, look, we are only trying to find out what happened here. Nope. And he walks out.

R. at 3107–08. And on direct examination, Detective Samp made at least three references to Kubsch's invocation of his right to silence. One of these references was particularly instructive:

So then I explained to [Kubsch] the fact that Beth had been found dead, and knowing that, did that change anything, did he still not want to talk to us, and he said, yes, he didn't want to talk to us, so at that point he was free to leave.

R. at 839–40.

As for the trial court's opportunity to grant a motion for mistrial or give a curative instruction, when the trial court overruled Kubsch's objection to the videotape, Kubsch asked the trial court to give a limiting instruction. The limiting instruction would have provided that a defendant's silence in the face of *Miranda* warnings is inherently ambiguous and cannot be used against him. The court said that it would give a limiting instruction, but that the instruction would provide that a person has the right to invoke the Fifth Amendment and to change his mind re-

4. For example, Kubsch vigorously cross-examined the State's witness who testified that Kubsch's cellular phone records placed him near his house when he claimed to be in Michigan picking up his son. R. at 4335–52, 4358–61. Nail scrapings were taken from each victim, and the DNA recovered was compared to Kubsch's DNA. The DNA from the victims' nail scrapings did not match Kubsch's DNA. R. at 3860. Furthermore, no fingerprints were recovered from the knife or duct tape. As for the duct tape packaging found in his vehicle, Kubsch contended that he often kept duct tape in his vehicle for use at his rental properties. Kubsch also gave an explanation why the September 18th bank receipt with Beth's fingerprints on it was found in his vehicle. R. at 5301–02. As for Penn's trial testimony about the conversation she overheard at the Mishawaka restaurant, Penn's boyfriend also testified at trial and disavowed her story. R. at 5111–18. Furthermore, Penn received a $1,000 reward from Crimestoppers for providing this information to the police. R. at 4426.

garding that invocation. Ultimately, no limiting instruction was given.

In addition to the five factors, we find particularly relevant the timing of the jury's verdict. On June 15, 2000, the last day of trial, the jury retired for deliberations at 2:15 p.m. At 8:30 p.m., the jury sent a note to the trial court requesting to view the videotape again. After a hearing outside the presence of the jury and over Kubsch's objection, the trial court replayed the entire videotape. It is not clear from the record what time the videotape was replayed. However, at 10:37 p.m., the jury reached a verdict. In light of the five factors and the fact that the jury finally reached a verdict just shortly after watching the videotape for a second time, we conclude that the State has not carried its burden in demonstrating that the references to Kubsch repeatedly invoking his right to silence are harmless beyond a reasonable doubt. Accordingly, we reverse the trial court on this issue and remand this cause for a new trial. We now address those issues likely to arise on retrial.

## II.

### *Search of the Truck*

Kubsch complains the trial court erred by admitting into evidence over his continuing objection various items seized from his truck, including a cellular telephone, a package of duct tape, and a receipt from a Meijer department store. Acknowledging the items were seized as the result of a consent to search, Kubsch contends the search was not valid and even if valid the search exceeded the scope of the consent. Also, insisting that he was in custody at the time the consent was given, Kubsch argues the police failed to "scrupulously honor" his invocation of his right to remain silent under *Miranda*. Thus, the argument continues, any evidence seized was

the "fruit of the poisonous tree" and should not have been admitted at trial.

### A. *Custodial interrogation*

The record shows that Kubsch talked to police on two separate occasions on the day the bodies were discovered. On the first occasion Kubsch was advised that his home was a crime scene and was asked to accompany police to the Special Crimes Unit to answer routine questions. Upon arrival, Kubsch was seated in the lobby. At the time, police had discovered only two bodies at Kubsch's home: Rick and Aaron Milewski. Detective Michael Samp testified, "at that point I needed to ask some questions and try to ascertain what was going on." R. at 830. Although not under arrest, Kubsch was advised of his *Miranda* rights. R. at 844. However, Detective Samp was clear that Kubsch "wasn't a suspect. He wasn't under arrest." R. at 846. During the course of the subsequent interview, Kubsch told Detective Samp that he wanted to talk with his wife's mother. At that point Detective Samp testified, "I said that was fine, that he wasn't under arrest, that he could go ahead and go. And he got up, and I opened the door for him, and he walked out." R. at 831.

About an hour after Kubsch left the interview room, police were informed that the body of Kubsch's wife had also been discovered in the parties' home. Deciding to let Kubsch know about the discovery, Detective Samp directed another officer, Detective Mark Reihl, to find Kubsch and escort him back to the station. He did so, and upon entering the interview room, Kubsch was advised that the officers wanted to ask some more questions. In response Kubsch replied, "Can I tell you this one thing [ ] I know this is routine for you guys but at this point I really don't want to answer anymore questions." R. at 914.

Detective Reihl then asked for permission to search Kubsch's truck. Kubsch agreed and signed a consent to search form. The following colloquy describes the events occurring thereafter:

Q. [Prosecutor] After you had him complete [the consent to search] form, what happens with Mr. Kubsch?

* * *

A. [Detective Samp] So then I explain to him the fact that Beth had been found dead, and knowing that, did that change anything, did he want to talk to us, and he said, yes, he didn't want to talk to us, so at that point he was free to leave.

Q. [Prosecutor] In fact did he leave?

A. [Detective Samp] Yes.

R. at 839–840.

▮▮▮ Under *Miranda* " 'interrogation must cease' when the person in custody indicates that 'he wishes to remain silent.' " *Michigan v. Mosley*, 423 U.S. 96, 101, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (quoting *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Also, under the Indiana Constitution "a person in custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given." *Jones v. State*, 655 N.E.2d 49, 54 (Ind. 1995).[5] However, these *Miranda* safeguards do not attach unless "there has been such a restriction on a person's freedom as to render him 'in custody.' " *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind. 1995) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Here, focusing on the fact that he was initially driven to the police station in

the back of a locked squad car and that he was returned to the station for a second interview after invoking his right to remain silent, Kubsch contends he was in custody during the time he was questioned by the officers. These facts are not controlling. Rather, to determine whether a defendant is in custody "we apply an objective test asking whether a reasonable person under the same circumstances would believe themselves to be under arrest or not free to resist the entreaties of the police." *Torres v. State*, 673 N.E.2d 472, 474 (Ind.1996) (quotation omitted). Further, a person is not in custody where he is "unrestrained and ha[s] no reason to believe he could not leave." *Huspon v. State*, 545 N.E.2d 1078, 1081 (Ind.1989). We conclude that no reasonable person in Kubsch's position would have believed that he was under arrest. Not only did he have reason to believe he could leave, he was unrestrained and actually did leave, after both the first and second interview. Despite Kubsch's arguments to the contrary, he was not in custody when he gave police consent to search his truck.

*B. Voluntariness of consent*

▮▮▮ Pointing to his allegedly "vulnerable" mental state, stating he had no prior experience with police, and alleging "subtly coercive police questions," along with asserting "trickery, deceit and misrepresentation," Kubsch contends that his consent was not voluntary. Br. of Appellant at 27–29. Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Perry v. State*, 638 N.E.2d 1236, 1240 (Ind.1994). In cases involving a warrantless search the State bears the burden of proving an exception

---

5. The Indiana Constitution provides greater protection than provided by federal law. *See, e.g., United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir.1995); *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir.1993) (declaring that a consent to search is not a self-incriminating statement, and therefore a request to search does not amount to interrogation).

to the warrant requirement. *Short v. State,* 443 N.E.2d 298, 303 (Ind.1982). A valid consent is such an exception. In turn, a consent to search is valid except where procured by fraud, duress, fear or intimidation or where it is merely a submission to the supremacy of the law. *Martin v. State,* 490 N.E.2d 309, 313 (Ind. 1986). Despite Kubsch's assertions to the contrary, the record before us simply does not support the view that the consent Kubsch gave police was the product of fraud, duress, fear or intimidation. Further, Kubsch makes no claim that he was merely submitting to the supremacy of the law when he consented to the search of his truck. Accordingly, we conclude that Kubsch's consent was freely and voluntarily given.

*C. Scope of consent*

Relying on the police request to "look inside" his truck, and his response "yes—over at the house," R. at 915, Kubsch contends that even if his consent to search were voluntarily given, the evidence seized as a result still should have been suppressed because the search exceeded the scope of the consent. According to Kubsch: (i) the search should have been conducted at the location where the truck was parked, and thus police had no authority to impound the truck in order to conduct a search; and (ii) the search was limited only to looking inside the truck.

■■■ It is true that a consensual search allows a suspect to limit or restrict the search as he or she chooses. *Krise v. State,* 746 N.E.2d 957, 964 (Ind.2001). However, the scope of a consensual search is measured by objective reasonableness and is determined by what a "typical reasonable person would have understood by the exchange between the officer and the suspect." *Id.* (quoting *Florida v. Jimeno,*

500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). Here, in addition to the verbal exchange between Kubsch and Detective Samp, the "consent to search" that Kubsch signed provided in pertinent part:

> I grant permission for ... a search, [and] hereby *authorize, consent and allow Special Crimes to conduct a complete search of my motor vehicle* which is *(located at )* (described as) corner of Prism Valley, 1994 Geo Tracker. The above mentioned person(s) and any others needed to assist them are hereby *authorized by me to take from my ... motor vehicle any merchandise, personal property, or chattels* that may be involved in the investigation they are conducting.

R. at 919 (emphasis added). It is clear that a "complete search" of Kubsch's truck would encompass considerably more than simply looking inside the vehicle. Also, we agree with the trial court that Kubsch's statement "yes—over at the house" was not tantamount to saying, "you can search it but *only* if you search it where it sits." R. at 263 (emphasis in original). Rather, it is apparent that Kubsch's response was intended to assist the police in locating the vehicle, rather than to restrict or limit the scope or location of the search to be conducted. In searching Kubsch's truck, the police did not exceed the scope of the voluntary consent. We conclude that the trial court did not err by admitting into evidence the items seized as a result of the search.

### III.

### *Hearsay*

■■■ Kubsch next contends the trial court erred by allowing into evidence the hearsay testimony of Dave Milewski and

Diane Raisor.[6] Respectively, Milewski and Raisor are the uncle and grandmother of murder victim Aaron Milewski. Over Kubsch's hearsay objection Milewski testified that several weeks prior to his death, Aaron told him that he was "frightened" of Kubsch. R. at 3278. Also over Kubsch's objection Raisor testified that a few weeks before his death, Aaron told her "Wayne still wants to kill me." R. at 4537.

▪ Hearsay is a statement made out-of-court that is offered into evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c); *Craig v. State*, 630 N.E.2d 207, 209 (Ind.1994). It is clear that the contested portions of both Milewski's and Raisor's testimony are hearsay. Aaron made the statements out-of-court and the witnesses repeated the statements at trial for the purpose of proving the matter asserted, namely: that Aaron feared Kubsch and felt that Kubsch wanted to kill him. Such hearsay is not admissible at trial unless it fits within some exception to the hearsay rule.

The trial court admitted the witnesses' hearsay testimony pursuant to Indiana Evidence Rule 803(3), which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

> * * *

> (3) A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it related to the execution, revocation, identification, or terms of declarant's will.

▪ In addition to the requirement that hearsay fall within an exception to be admissible, the Indiana Rules of Evidence also mandate that only relevant evidence is admissible. Evid. R. 402. Evidence is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. A victim's state of mind is relevant where it has been put at issue by the defendant. *Jester v. State*, 724 N.E.2d 235, 240 (Ind.2000); *Smith v. State*, 721 N.E.2d 213, 218 (Ind.1999). For example in *Ford v. State*, 704 N.E.2d 457 (Ind. 1998), the victim's statements prior to her death concerning her "unhappy" relationship with the defendant, and her fear that if she left the defendant "he would kill her," were admissible to controvert evidence presented by the defendant showing the victim acted aggressively towards him and provoked his actions. *Id.* at 459–60. Here, however, Kubsch did not put Aaron's state of mind at issue. Rather, his defense at trial was that he was in Michigan picking up his son when the crimes were committed and that Beth and Aaron were likely murdered by Kubsch's lifelong friend Brad Hardy. In fact, the contested

---

**6.** Kubsch also contests the hearsay testimony of State's witness James Filbert. The record shows that during his presentation of the evidence, Kubsch introduced testimony through Stanley Feathers implying that Kubsch neither possessed nor had access to a handgun. *See* R. at 5164–65. On rebuttal, the State called Filbert, a long time acquaintance of Beth Kubsch. Over Kubsch's objection Filbert testified Kubsch "had a gun in the house" which he kept "in a closet in a box . . . [in] the bedroom." R. at 5228. Otherwise inadmissible evidence may become admissible where the defendant "opens the door" to questioning on that evidence. *Gilliam v. State*, 270 Ind. 71, 383 N.E.2d 297, 301 (1978). Contrary to Kubsch's claim, the trial court properly admitted the testimony because Kubsch opened the door.

hearsay testimony was introduced during the State's case in chief. We conclude therefore that it is not relevant to any issue at trial. The trial court thus erred in allowing the testimony into evidence.

## IV.

### *Opinion Testimony*

Kubsch next contends the trial court erroneously allowed into evidence the opinion testimony of a homicide investigator. The facts are these. Detective Steven E. Richmond was a detective sergeant with the South Bend police department assigned to the Special Crimes Unit as a homicide investigator. Detective Richmond was one of the investigators on this case and testified at length at trial. A part of his testimony concerned blood spatter evidence, to which no objection was made. At one point during his testimony the detective testified that he observed duct tape covering Beth Kubsch's face. The following exchanged then occurred:

> Q. [Prosecutor] In your experience as a homicide investigator with your training, did that—the existence of that duct tape on this victim's face have any significance to you or the other investigators?
>
> A. [Detective Richmond] Yes it did.
>
> Q. [Prosecutor] In what way?
>
> A. [Detective Richmond] During the training, an investigator is taught to, you know, pick up on certain clues, behavioral traits that we might find as far as evidence, something that happened in the thing. Oftentimes if a victim is masked, so to speak, by his face is covered, that's sometimes used as a sign—

R. at 3779–80. At this point Kubsch objected on foundation grounds. During a side-bar conference the trial court expressed skepticism on whether the officer possessed expertise in the area on which

he was about to testify. The trial court observed, "[h]is expertise is blood spatter. I don't know that he's been qualified as a psychologist as to how victims are treated by taping." R. at 3780. The State then proceeded to lay a purported foundation for the officer's testimony. Responding to a number of questions posed by the State, Detective Richmond testified that he had investigated a large number of homicide scenes, and attended numerous homicide investigation seminars, some of which involved "conducting investigations of the crime scene as far as association with suspect and victim relationship, stranger homicide or killings.…" R. at 3782. When asked about the content of the seminars, Detective Richmond responded, "[t]hey discuss previous cases, documented cases, proven investigative techniques that other officers have used in the past." R. at 3783. Detective Richmond went on to say, "there are materials that were given to read. I have library books on all the different varieties." R. at 3783. Over Kubsch's objection the detective then testified:

> A. [Detective Richmond] It's been my training that oftentimes when a victim's face is covered, it's done to disassociate the victim from the suspect. It turns the victim from a person to an object.
>
> Q. [Prosecutor] And in your experience and training, is that fact more associated with cases where the killer knows or has a relationship with the victim?
>
> A. [Detective Richmond] Exactly.

R. at 3785. Kubsch contends the foregoing testimony should not have been permitted because the State failed to lay a foundation demonstrating that the proffered testimony was scientifically reliable.

■■■■ Indiana Evidence Rule 702 provides:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Evid. R. 702. Under this rule, a witness may be qualified as an expert by virtue of "knowledge, skill, experience, training, or education." *Id.* And only one characteristic is necessary to qualify an individual as an expert. *Creasy v. Rusk,* 730 N.E.2d 659, 669 (Ind.2000). As such, a witness may qualify as an expert on the basis of practical experience alone. *Id.* It is within the trial court's sound discretion to decide whether a person qualifies as an expert witness. *Id.* In this case, we have serious doubts as to whether a police detective with experience investigating homicide scenes and attending seminars exploring victim/suspect relationships qualifies as an expert in an area involving rather complex behavioral and social science issues. However, we decline to substitute our judgment for that of the trial court on this matter of discretion. Nonetheless, "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." *West v. State,* 755 N.E.2d 173, 180 (Ind.2001) (quoting Evid. R. 702(b)).

When determining whether scientific evidence is admissible under 702(b), we consider the factors discussed in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In that case the Supreme Court held that for scientific knowledge to be admissible under Federal Evidence Rule 702, the trial court judge must determine that the evidence is based on, among other things, scientifically valid methodology. *Id.* at 592–93, 113 S.Ct. 2786. To assist trial courts in making this determination, the Court outlined a non-exclusive list of factors that may be considered: whether the theory or technique can be and has been tested, whether the theory has been subjected to peer review and publication, whether there is a known or potential error rate, and whether the theory has been generally accepted within the relevant field of study. *Id.* at 593–94, 113 S.Ct. 2786.

■ This court has held that the concerns driving *Daubert* coincide with the express requirement of Indiana Rule of Evidence 702(b) that the trial court be satisfied of the reliability of the scientific principles involved. *Steward v. State,* 652 N.E.2d 490, 498 (Ind.1995). Thus, although not binding upon the determination of the state evidentiary law issues, the federal evidence law of *Daubert* and its progeny is helpful to the bench and bar in applying Indiana Rule of Evidence 702(b). *Id.* Also, the proponent of expert testimony bears the burden of establishing the reliability of the scientific tests upon which the experts' testimony is based. *See McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind.1997).

■ Here, the State has not shown that the general subject of victim/suspect relationships is based on reliable scientific methodology. The State presented no evidence even suggesting that this subject can be or has been tested, has been subjected to peer review and publication, or whether there is a known or potential error rate. Further, testimony that Detective Richmond received instruction on victim/suspect relationships and possesses library books on this area of study is not sufficient to show that it has been generally accepted within the study of social or behavioral sciences. We have no doubt

that the existence of certain behavioral characteristics of either suspects or victims may provide investigating officers with useful and important clues in solving or preventing crimes. However, it is another matter to say that evidence concerning a particular investigative technique is reliable enough to be admitted at trial. The trial court erred by permitting Detective Richmond to testify concerning the significance of duct tape covering Beth Kubsch's face because it was not proper expert testimony under Indiana Evidence Rule 702.

On appeal the State makes no claim that Detective Richmond was testifying as an expert witness. Rather, according to the State, Detective Richmond was testifying as a "skilled lay observer." Br. of Appellee at 50. We first observe that the ground the State now asserts is not the basis on which the trial court allowed the testimony. Instead, the trial court specifically acknowledged that Detective Richmond was testifying as an expert witness.[7] In any event the State still cannot prevail on this issue.

Although a witness may not be qualified to offer expert testimony under Indiana Evidence Rule 702, the witness may be qualified as a "skilled witness" (sometimes referred to as a "skilled lay observer"), *see* *Warren v. State*, 725 N.E.2d 828, 831 (Ind. 2000), under Indiana Evidence Rule 701. A skilled witness is a person with "a degree of knowledge short of that sufficient

to be declared an expert under [Indiana Evidence] Rule 702, but somewhat beyond that possessed by the ordinary jurors." 13 Robert Lowell Miller, Jr., *Indiana Evidence* § 701.105, at 318 (2d ed.1995). Under Indiana Evidence Rule 701, a skilled witness may provide an opinion or inference that is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Evid. R. 701.

■ "Perception" has been defined as "[t]he process, act, or faculty of perceiving .... [i]nsight, intuition, or knowledge gained by perceiving." *The American Heritage College Dictionary* 1014 (3d ed.1993). In turn, "perceive" has been defined as "[t]o become aware of directly through any of the senses, esp. sight or hearing." *Id.* at 1013. In this case Detective Richmond's opinion that when a victim's face is covered it is often done to disassociate the victim from the suspect and that it happens more in cases where the victim and suspect know or have a relationship with each other, was not rationally based upon his perceptions. There was nothing that Detective Richmond either saw or heard at the scene of the crime, or became aware of through his other senses, that supported the basis for his opinion. Rather, the detective's opinion was based on his understanding of a phenomenon which the State in this case has not shown to be scientifically reliable.

---

7. The record shows that just before the State began to question Detective Richmond on the significance of the duct tape, the trial court admonished the jury in part as follows:

> [N]ow ––– pardon me for interrupting. This witness is testifying and has given certain answers about his training in certain fields. When a witness does that, sometimes they are called a, quote, expert, meaning they have certain training that most people may not have.

> In such a case, a witness may be allowed to give that witness' opinion on the significance of some physical thing that the witness observed or is aware of ... You have to make your decisions about the evidence and what it signifies. But experts are allowed to give you their opinion and why they say it and what it's based on as an assist to you if you find it of assistance. That ultimately is up to you.
>
> R. at 3784–85

In sum, his testimony did not qualify as skilled witness testimony under Indiana Evidence Rule 701.

## V.

### *Admission of Photographs*

 Kubsch next contends the trial court erroneously admitted several photographs into evidence. However, other than complaining about the number of times the photographs were displayed to the jury, and generally asserting, "[t]he autopsy photographs were prejudicial," Br. of Appellant at 90, Kubsch does not tell us whether he objected to the admission of the photographs, the grounds for the objection, or whether he is complaining solely about autopsy photographs or other photographs. Our independent examination of the record shows that of the twenty-three photographs apparently at issue, some of which depicted the crime scene and others of which depicted the autopsy examinations, fifteen were admitted into evidence with no objection from Kubsch. *See* R. at 3364, 3366, 3375, 3752, 3997, 3998, 3999. Failure to object at trial to the admission of evidence results in waiver of that issue on appeal. *Woods v. State,* 677 N.E.2d 499, 504 (Ind.1997). For the remaining eight photographs, Kubsch objected to two of them—which depicted the crime scene—on grounds that they were cumulative. *See* R. at 3370, 3752. The admission of cumulative evidence does not itself warrant a new trial. *Duncan v. State,* 735 N.E.2d 211, 213 (Ind.2000). Rather, the appellant must show that unfair prejudice flowing from the evidence outweighs its probative value. *Id.* Here, Kubsch has made no such showing.

 The six photographs left are autopsy photographs of Beth and Aaron. Kubsch objected to their admission into evidence on grounds that they were grue-some, cumulative, and served only to prejudice the jury. *See* R. at 3990, 3996, 4020, 4015, 4018. Photographs depicting the victim's injuries or demonstrating a witness' testimony are generally relevant therefore admissible and will not be rejected merely because they are gruesome or cumulative. *Wright v. State,* 730 N.E.2d 713, 720 (Ind. 2000); *Harrison v. State,* 699 N.E.2d 645, 647 (Ind.1998). The photographs at issue establish the cause of death and the manner in which the crime was committed. They also show wounds to the victims at different angles. Although gruesome, these photographs were not needlessly cumulative and were not introduced solely for the purpose of inflaming the jurors' emotions. This Court reviews the trial court's decision to admit photographic evidence for an abuse of discretion. *Cutter v. State,* 725 N.E.2d 401, 406 (Ind.2000). We find no abuse here.

## VI.

### *Opportunity to Present a Defense*

Contending that the time of death of all three victims was critical to his defense, Kubsch complains that the State never established the time of death and that the trial court "barred" him from "presenting evidence that the time of death could have been proven within a definite period." Br. of Appellant at 35. According to Kubsch, the trial court's action denied him a meaningful opportunity to present a defense. To support his claim, Kubsch directs our attention to the testimony of Dr. Robert Tomec, the pathologist who conducted the autopsies, and the testimony of Officer Thomas Mammon, a crime scene investigator.

 "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth

Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citations omitted) (quotation omitted). As the Supreme Court has also observed:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

*A. Examination of the pathologist*

During cross-examination, the pathologist affirmed that he did not attempt to establish a time of death for the victims. The following exchange then occurred:

Q. [Defense Counsel] What would be the things that you would look at to determine time of death?

A. [Pathologist] There are a number of factors that can be examined to try to determine a range cause of death I'm sorry, a time of death, and those include lividity and rigidity that we already discussed as well as other factors like the temperature of the body.

* * *

Q. [Defense Counsel] Did you at all make an attempt to look at or determine time of death?

A. [Pathologist] I recorded certain findings of rigor and lividity, but other

than that, I do not try to determine—a time of death at the time of the autopsy.

Q. [Defense Counsel] If you yourself were not present at the scene, what information would be useful to you to determine time of death?

R. at 4038. At that point the State objected. After a side-bar conference the trial court sustained the objection on grounds of materiality. Specifically, the trial court declared:

I mean you're asking him to answer a question [in] an ideal world, if he had had this, and this, could he have made a determination. And probably he could tell you what he could know if he had temperature, if he had opacity of eyes ... In an ideal world could he have determined, yes, but so? No, there's nothing in this evidence that we can go on, you know, there's nothing. It's a non-question. It's immaterial. Okay?

R. at 4041.

Relevant evidence is, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. The two components of relevant evidence are materiality and probative value. "If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial." 1 *McCormick on Evidence* § 185, at 637 (John W. Strong ed., 5th ed.1999).

In the form posed by the defense, the question to the pathologist did not appear to be probative of anything at all. The pathologist had already testified that he had not made a time of death determination. In fact during further cross-examination, the pathologist was even more explicit: "I was not at the scene. That's correct. And I do not—have never gone

to the scene of a homicide so that I'm not in the practice of doing that type of work [taking measurements needed to determine time of death]." R. at 4041–42. Only in the context of the argument Kubsch now makes on appeal, is it plausible that the contested testimony of the pathologist may have been both relevant and material. In this appeal, Kubsch essentially advances the argument that he wanted to demonstrate that the police were deficient in gathering the necessary "time of death" evidence from the crime scene. If the police had done so, the argument continues, then they could have provided that information to the pathologist. In turn, it was necessary to examine the pathologist on exactly what type of evidence could have been gathered and thus may have assisted the pathologist in making a time of death determination. However Kubsch made no such argument before the trial court. Rather, he merely commented, "[w]ell, time of death is an important question, Judge." R. at 4040. Because the question is important, does not necessarily mean that it is relevant or material.

 In any event, limiting the cross-examination of the pathologist was not a ban on Kubsch "presenting evidence that the time of death could have been proven within a definite period." Br. of Appellant at 35.[8] Trial judges retain wide latitude to impose reasonable limits on the cross-examination of witnesses based on concerns about, among others things, interrogation that is only marginally relevant. *Smith v. State*, 721 N.E.2d 213, 219 (Ind.1999). As we have indicated, the question asked of the pathologist was not just marginally relevant. As posed, it did not appear to be relevant at all. Lacking relevance, the question thus lacked materiality. The trial court's ruling on this issue was correct.

### B. Examination of the crime scene investigator

During the direct examination of Thomas Mammon, a crime scene investigator, the State established that when the officer arrived at the scene at about 6:00 p.m. on September 18, 1998, he and other officers were "waiting on a search warrant for the home." R. at 3586. A warrant arrived around 9:00 p.m. at which time Mammon and the other officers began processing the scene. Defense counsel followed-up on this testimony during cross-examination. At one point counsel asked the officer, "you're aware that you could have gotten the consent from a homeowner to search the house?" R. at 3600. The State objected and after a side-bar conference the trial court sustained the objection and admonished the jury as follows:

[A]s stated, the question would call for a conclusion from this witness that would be simply conjecture, that if a homeowner were present and if he were asked, that he might have consented to such a search.

There's nothing in this evidence to suggest that this witness knew that the homeowner was there. He said he didn't. And even if he did, there is no evidence thus far to suggest that he was asked or that he would have consented or would not have consented if he were asked. And therefore to ask this witness that question is an improper question. It calls for speculation.

8. In fact the record shows that on redirect examination by the State, the pathologist testified, "in a general sense ... only a range of time of death can be determined not an exact time of death." R. at 4047. In addition, the pathologist agreed with the question posed by the State, "[t]here is no method known to man presently that you can determine the exact time of a person's death; is that correct." R. at 4047.

R. at 3604. On appeal Kubsch does not contest the underlying bases for the trial court's ruling. Rather, contending that the response from the officer was an important component of the defense's time of death claim, Kubsch insists that by sustaining the State's objection the trial court denied him the right to present a meaningful defense. To demonstrate the significance of Officer Mammon's testimony on this issue, Kubsch essentially makes the following argument. At the time police officers first arrived at the crime scene relevant evidence existed that could have assisted the pathologist in determining the time of death. The argument continues that because the officers waited for a search warrant, rather than taking steps immediately to obtain a consent to search, valuable information was lost. *See generally* Br. of Appellant at 37–40.

Regardless of Kubsch's theory of defense, evidence to support the theory must comply with applicable evidentiary rules. An answer to a question of a witness that calls for speculation and conjecture is not admissible. Because it is axiomatic that a ruling or a verdict should not be based upon "evidence which is conjectural," *Lindsey v. State*, 485 N.E.2d 102, 106 (Ind.1985), "[t]o require a witness to answer hypothetical questions based upon facts not established would invite speculation." *Id.* at 106–07. As such, an objection to such a question would be properly sustained. *See id.* at 107. The trial court correctly ruled that "as posed" Kubsch's question to the officer was improper. Contrary to Kubsch's claim on appeal, he was not denied the right to advance his theory of defense. Rather, he simply could not ask an improper question in doing so. We find no error here.

### Conclusion

The admission into evidence of portions of a videotape showing Kubsch invoking his constitutional right to remain silent violated the Due Process Clause of the Fourteenth Amendment as articulated in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Because the error in admitting the unredacted videotape was not harmless beyond a reasonable doubt, we are constrained to reverse the judgment of the trial court and remand this cause for a new trial.

Judgment reversed and cause remanded.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.