## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 19 2018, 9:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Shawn D. Parker, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | April 19, 2018 <br><br> Court of Appeals Case No. <br> 20A03-1709-CR-2237 <br><br> Appeal from the St. Joseph <br> Superior Court <br><br> The Honorable Dean O. Burton, <br> Judge Pro Tempore <br><br> Trial Court Cause No. <br> 20D01-1605-F3-18 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Shawn D. Parker (Parker), appeals his conviction for two Counts of rape, Level 3 felonies; and one Count of kidnapping, a Level 5 felony.

We affirm.

# ISSUE

Parker raises one issue on appeal, which we restate as: Whether Parker was denied his due process right to a fair trial.

# FACTS AND PROCEDURAL HISTORY

In 2015, Parker was employed as "an independent contractor" for Ron Davidhizar (Davidhizar). (Tr. Vol. II, p. 148). Davidhizar buys, remodels, and rents houses in Goshen, Elkhart County, Indiana, and he hired Parker to assist with projects and "odd jobs." (Tr. Vol. II, p. 148). Davidhizar owns a property located at 1413 South Main Street in Goshen (1413 Property), which he leased to Valerie Hunley (Hunley) and her children beginning in May of 2015. Davidhizar also owns a vacant house located at 521 South Main Street in Goshen (521 Property). Several times per week, Parker stopped by the 1413 Property, ostensibly to "fix different things in the house that was [*sic*] falling apart." (Tr. Vol. III, p. 44).

On the afternoon of July 28, 2015, seventeen-year-old H.A., who was then friends with Hunley's oldest daughter, A.H., walked to the 1413 Property,

hoping to "hang out" with A.H. as they regularly did. (Tr. Vol. II, pp. 185-86). At the time, Parker was at the 1413 Property, and Hunley indicated that H.A. could not stay. Accordingly, H.A. commenced walking back to her house. A short time later, as H.A. waited to cross the street at a stoplight, a green Dodge Durango pulled up next to her. Parker emerged, walked over and grabbed H.A., and forced her into the back seat. As Parker drove off, H.A. unsuccessfully attempted to open the door to escape. Parker drove to the 521 Property, which H.A. described as "abandoned" and "really trashy." (Tr. Vol. II, pp. 188, 190). Parker dragged H.A. out of the vehicle and into the 521 Property through a rear door as H.A.'s screams for help went unheard. Parker pushed H.A. down onto the filthy floor, grabbed her head, and made her perform fellatio. He then grabbed her legs, removed her pants and underwear, and "shoved his penis into [her] vagina and was pushing really hard on [her]. Then he gets off." (Tr. Vol. III, p. 8). At that point, Parker released H.A. and "[t]old [her] not to tell nobody [sic]." (Tr. Vol. II, p. 191).

[6] Hysterical, scratched, and covered in paint debris from the floor, H.A. ran to a friend's house. Once H.A. was calm enough to inform her friend that "she got raped" by a man named "Shawn," they called the police. (Tr. Vol. II, pp. 161, 162). H.A. indicated that she was experiencing pain and was transported to Goshen Hospital by ambulance. At the hospital, a sexual assault nurse examiner (SANE) interviewed H.A, and a rape kit was completed. The SANE observed some bruising and tearing to H.A.'s genital area and determined that the physical examination was consistent with H.A.'s recitation of events.

[7]     Based on H.A.'s identification of "Shawn" as the perpetrator and the other information provided, the investigating officers summoned Parker for an interview and apprised him of the allegations. (Tr. Vol. II, p. 118). At that time, Parker asserted his right to have an attorney present for any questioning. Subsequently, Detective Kyle Priem (Detective Priem) obtained a warrant to collect a sample of Parker's DNA. When Parker appeared at the police station to submit his sample per the warrant, Parker questioned Detective Priem as to what he needed to do "to prove that [he had] done nothing wrong" and as to whether "it [was] looking bad on [him]." (State's Exh. 4). Detective Priem asked whether Parker had yet retained an attorney, and when Parker indicated that he could not afford the legal fees, Detective Priem inquired as to whether Parker wanted to speak with a representative from Legal Aid to be present for Parker to give his "side of the story." (State's Exh. 4). Detective Priem stated that he did not "want to get into anything with [Parker]" based on his previously-asserted desire for representation, but Parker nevertheless insisted that he never "touched" H.A. and that he "would [bet] a million dollars" that his DNA would not be found on H.A. (State's Exh. 4). At some point, H.A. identified Parker in a photo array as her assailant.

[8]     The Indiana State Laboratory later compared Parker's DNA to the specimens included in H.A.'s rape kit. Seminal material was discovered on external genital swabs taken from H.A. The DNA profile was consistent with that of Parker—specifically, it was "estimated to occur once in 4.5 trillion unrelated individuals." (State's Exh. 29). On May 2, 2016, the State filed an

Information, charging Parker with Counts I and II, rape, Level 3 felonies, Ind. Code § 35-42-4-1(a)(1); Count III, kidnapping, a Level 5 felony, I.C. § 35-42-3-2(a),(b)(1)(B); and criminal confinement, a Level 5 felony, I.C. § 35-42-3-3(a),(b)(1)(B). The State also charged Parker as being a repeat sexual offender pursuant to Indiana Code section 35-50-2-14.[1]

[9] On August 15 through 17, 2017, the trial court conducted a jury trial. At the close of the evidence, the jury returned guilty verdicts on all four Counts. Thereafter, Parker admitted to being a repeat sexual offender. On September 11, 2017, the trial court held a sentencing hearing. The trial court merged Count IV into Count III and sentenced Parker to twelve years each for Counts I and II, Level 3 felony rape; and four years for Count III, Level 5 felony kidnapping. The sentences were ordered to run concurrently. Based on Parker's repeat sex offender status, the trial court then enhanced the sentence by nine years, with seven years to be executed and two years suspended to probation. Accordingly, Parker received an aggregate sentence of twenty-one years, with nineteen of those years to be executed in the Indiana Department of Correction. The trial court further determined that Parker is to be classified as a sexually violent predator.

[10] Parker now appeals. Additional facts will be provided as necessary.

---

[1] On November 3, 1998, Parker was convicted of felony rape in Georgia. He was sentenced to fifteen years and was released from incarceration on May 15, 2013. Parker also has a 1990 conviction for statutory rape out of Georgia, for which he received a five-year sentence.

# DISCUSSION AND DECISION

[11] On appeal, Parker claims that his right to due process was violated when the State presented evidence to the jury indicating that Parker had invoked his right to an attorney. We review claims of federal constitutional error *de novo*, and any error must be harmless beyond a reasonable doubt. *Anderson v. State*, 961 N.E.2d 19, 28 (Ind. Ct. App. 2012), *trans. denied*. Here, Parker contends that he was denied a right to a fair trial in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). In *Doyle*, the Supreme Court "held that under the Fourteenth Amendment a prosecutor may not use the silence of a defendant who has been arrested and Mirandized to impeach the defendant." *Sobolewski v. State*, 889 N.E.2d 849, 857 (Ind. Ct. App. 2008) (citing *Doyle*, 426 U.S. at 619), *trans. denied*. Because *Miranda* warnings "inform a person of his right to remain silent," there is an implicit assurance to a defendant that his silence will not subsequently be used against him. *Id.*

[12] Unless the defendant opens the door to its admission, "post-*Miranda* silence is generally not admissible" out of concern for the Due Process Clause's "prohibition against fundamental unfairness." *Barton v. State*, 936 N.E.2d 842, 851 (Ind. Ct. App. 2010), *trans. denied*; *Sobolewski*, 889 N.E.2d at 856. "[A] defendant's prearrest, post-*Miranda* silence enjoys the same protection as a defendant's postarrest, post-*Miranda* silence." *Kubsch v. State*, 784 N.E.2d 905, 914 (Ind. 2003). "'Silence' does not mean only muteness; it includes the statement of a desire to remain silent as well as a desire to remain silent until an attorney has been consulted." *Id.* The *Doyle* rule is not limited solely to use for

impeachment purposes; "it also applies to the use of a defendant's silence as affirmative proof in the State's case in chief." *Id.*

[13] When Parker appeared at the police station to have his DNA collected pursuant to a search warrant, he engaged in the following video-recorded discussion, in pertinent part, with Detective Priem:

> Parker:　　What would it take to prove that I haven't done nothing wrong?  Look . . . I've kept my nose clean, stay out of stuff.
>
> Detective:　Uh-huh.
>
> Parker:　　Period.
>
> Detective:　Yeah.
>
> Parker:　　What will it take to prove I haven't?
>
> Detective:　Well.  One, I'd like to get your side of the story.
>
> * * * *
>
> Parker:　　I don't go out and drink, I don't go to bars, I don't do nothin'.
>
> Detective:　Mmhmm.
>
> Parker:　　The one time I took a minute off and here I am, seeing you.
>
> Detective:　Mmhmm.  Well, it's . . . nothing personal.  Trust me . . .
>
> Parker:　　I know it's nothing personal . . .

Detective       . . . But I do have to follow up with the information that was provided to me.  Okay?

Parker:          Can you tell me how this is looking on me?

Detective:      Okay.  Umm, right now, I've got, like I said, one side of the story and some . . . witnesses saying, you know, saying . . . kind of saying what they know. . . .

Parker:          . . . Is it looking bad on me?  Don't know.  Up in the air.  I don't see how it can look bad because . . . .

Detective:      I don't know at this point.  I can't tell you cuz I don't know what the result of . . . the evidence we've collected so far, and I don't know if anything's going to match with you.  You know, so, umm, that's what I'm, that's what I'm here to find out.  Okay.  Umm, let me go grab the gal that's gonna be doing this real quick . . .

* * * *

Detective:      . . . Did you . . . actually speak to Mike . . . Yoder, the attorney?

Parker:          No.  I went to, uh, Jenny Miller, and . . .

Detective:      Okay.  And, would he be willing, if you want him to, to come with you to talk about this?

Parker:          If I do that, it's gonna cost me $7,500.

Detective:      [Whistles]

* * * *

Parker:          . . . If you arrest me, I've got to sign over my house

and pay $10,000 for him to, for his father-in-law to represent me.

Detective: Interested in talking to some Legal Aid or something like that that might be able to assist you?

* * * *

[DNA and fingernail evidence collected]

Detective: So, think maybe you talk to somebody at Legal Aid to get you . . . some representation . . . . Otherwise, this is what I'm going to do is just get the information that I have or that information that I can get from anybody that had anything to do with this situation . . . and then send it over to the prosecutor's office to take a look at to see if there's anything . . . we're charging, so.

Parker: Look at Walmart's cameras, you'll see where I was.

Detective: Okay. When you left, are you talking about when you left?

Parker: At, me and [Hunley] went to Walmart. Look at Walmart's cameras.

Detective: . . . I talked to her about that.

Parker: At the time, she says that I did this, everything that I've heard, I was at Walmart. Look at the cameras.

Detective: With [Hunley]?

Parker: [Hunley and her daughter]. Look at it, they're time-dated.

Detective: Yeah, I talked with her about this, so, but, before I . . . I don't want to get into anything with you since you said you need an attorney, so, um, I don't want to ask you questions about

. . .

Parker:       How 'bout, how 'bout this?  I'll allow you to ask specific questions, if I don't feel comfortable . . . answering that question, I'll say so.

Detective:    Well, like I say, since you said . . . you wanted an attorney, I have to honor that right . . . for you to do that.  Okay.

Parker:       Only thing I can say is, I have not touched this girl.

Detective:    Okay.

Parker:       I have tried my damnedest to avoid this girl because people that, around me that work with me and everything know this girl, and they have warned me, avoid her with a passion.  And that's what I've tried to do.  If she was over at [Hunley's] house, and [Hunley] will vouch for this, I would stay the heck away or someone had to be around.  That's all I can say.  I have not, I will give you any DNA, blood, anything you want.  I have not . . .

Detective:    . . . If that, I mean, that may be what kind of eliminates you from this case as far as being a suspect, if we don't have the, you know . . .

Parker:       Now, in that house, yes, you might find my DNA.

Detective:    Yeah, we know you've been there.

Parker:       I've been there, I slept, it had a lot of . . . squatters, and, every so often, I would sleep there just to try to catch 'em, run 'em out.

Detective:    Okay.

Parker:       So, I've used the bathroom there.  Everything.  My

DNA is there, yes.

Detective:   Mmhmm.

Parker:       But, I . . . haven't touched her.

Detective:   Okay.

Parker:       I would not touch her, even though she's age of consent, if she tried to throw it on me, I would not touch her. Number one, she stinks. Gross. Number two, you can see she's trouble. I don't need trouble. The only place I go, if I go to drink a beer, is somewhere that's calm. Older folks. And that's very rare. Because if . . . there was something I could tell you, there's really nothing I can tell you.

Detective:   Okay. Like I say, you're not under arrest. . . .

* * * *

Parker:       . . . You gotta understand, be in my shoes . . .

Detective:   Mmhmm.

Parker:       What would you do?

Detective:   . . . I mean, I'd be concerned, absolutely. For sure.

Parker:       Any, anything. I've been told Indiana is a woman state.

* * * *

Detective:   Um, I don't know what to say about that.

Parker:       I don't know . . . I come up here to take care of my daughter, to, I work, that's it. I can, I would put a million

dollars, you will not find my DNA or none of her DNA under my nails on her. In the house, yes you might . . . it's gonna be there. You know that as well as I do.

\* \* \* \*

(State's Exh. 4). After the parties stipulated to certain redactions, the video-recorded meeting was admitted without objection.

[14] Parker now asserts that the numerous references to his invocation of his right to counsel in the jury's presence amounted to a *Doyle* violation. In addition to the admission of the video itself, which contained "a number of references by the investigator of Parker's earlier request for an attorney," Detective Priem testified prior to the admission of the video to provide context for Parker's statements and explained that Parker "had in our previous meeting requested that an attorney be present during questioning—if he was going to be questioned. I warned him that he had made that request, and I was going to honor that request but he continued to speak with me." (Appellant's Br. p. 8; Tr. Vol. II, p. 127). Parker also points out that "[w]hile the prosecutor did not specifically refer to the evidence that Parker had invoked his right to counsel, the prosecutor did make numerous references to the videotaped statement of Parker in her closing argument." (Appellant's Br. p. 9). Acknowledging his own failure to timely object during Detective Priem's testimony, the video-recording, and the prosecutor's closing argument—which would ordinarily result in waiver of the issue for appeal—Parker now maintains that the repeated remarks relating to his invocation of his right to counsel amounted to

fundamental error. *See Trice v. State*, 766 N.E.2d 1180, 1182 (Ind. 2002) (noting that an "error [is] not generally . . . available on appeal" where the defendant fails to object at trial).

[15] We need not address the parameters of the fundamental error doctrine in this case because we find no due process/*Doyle* violation, let alone one that rises to the level of fundamental error. There is no dispute that the jury was aware of Parker's request for an attorney at some point during the investigative process, but "*Doyle* does not impose a *prima facie* bar against any mention whatsoever of a defendant's right to counsel." *Id.* at 1183. Rather, *Doyle* "guards against the exploitation of that constitutional right by the prosecutor." *Id.* (quoting *Willsey v. State*, 698 N.E.2d 784, 793 (Ind. 1998)). In the present case, the State did not rely on Parker's post-*Miranda* silence to either "impeach an [exculpatory] explanation subsequently offered at trial" or otherwise "create an inference of guilt." *Teague v. State*, 891 N.E.2d 1121, 1125 (Ind. Ct. App. 2008) (quoting *Willsey*, 698 N.E.2d at 792). In fact, the State could not use Parker's silence against him because Parker failed to remain silent. It is well established that "if a defendant does not remain silent, he cannot later claim that the silence was used against him." *Trice*, 766 N.E.2d at 1184 (quoting *Sylvester v. State*, 698 N.E.2d 1126, 1130-31 (Ind. 1998)).

[16] When Parker arrived at the police station to submit his DNA sample, he advised Detective Priem that he wanted to clear his name. Thereafter, Detective Priem inquired as to whether Parker had obtained legal representation and explicitly stated that he intended to honor Parker's request

for counsel to be present. Detective Priem informed Parker that he would not engage in discussing the details of the case absent the presence of Parker's counsel. Yet, despite the fact that Detective Priem did not probe for any information, Parker voluntarily explained that he had never touched H.A. because "she stinks," and he assured Detective Priem that there was no chance that his DNA would be found on H.A. (State's Exh. 4). In fact, Parker's DNA was present on H.A.'s genital swabs, and the State was not prohibited from admitting Parker's voluntary statements to the contrary at trial. Accordingly, we conclude that the State did not violate *Doyle*, and Parker was not deprived of his right to a fair trial.

# CONCLUSION

[17] Based on the foregoing, we conclude that Parker is not entitled to a new trial because he was not denied his due process right to a fair trial.

[18] Affirmed.

[19] May, J. and Mathias, J. concur