**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

Dec 16 2013, 10:16 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**TERI A. FLORY**
Flory and Smith, Attorneys at Law
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL S. MCSHURLEY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 79A02-1302-CR-163 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE TIPPECANOE CIRCUIT COURT
The Honorable Gregg S. Theobald, Judge Pro Tempore
Cause No. 79C01-1109-FC-24

**December 16, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Michael S. McShurley appeals his convictions and sentence for three counts of child molesting as class C felonies. McShurley raises two issues which we revise and restate as:

I.  Whether the prosecutor committed prosecutorial misconduct that resulted in fundamental error; and

II. Whether McShurley's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

FACTS AND PROCEDURAL HISTORY

On July 22, 2000, McShurley, who was born on May 27, 1962, and L.M. were married. At that time, L.M. had four children including M.M. who was born on February 27, 1999, and McShurley had an autistic son from a previous marriage who also lived in the house. On December 3, 2003, McShurley adopted L.M.'s children. M.M. referred to McShurley as her dad.

Between April 1, 2011, and early June 2011, M.M. was watching a movie with McShurley when he started rubbing her stomach and then "started going under [her] underwear and he just kept going like deeper and deeper in . . . ." Transcript at 44. McShurley rubbed M.M. for three or four minutes. M.M.'s stepbrother then walked in the room, and McShurley quickly took his hand and placed it on M.M.'s stomach but then eventually placed his hand under her pants but over her underwear.

In early June 2011, M.M. took a shower and went to her room. McShurley knocked on M.M.'s door, and M.M. said, "hold on I'm naked." Id. at 45. McShurley "just walked right in" and said "I'm your dad it's okay." Id. McShurley looked at

2

M.M.'s hair and said that there was still conditioner in her hair and that she should wash her hair. M.M. went and rinsed her hair, and McShurley, who was just wearing shorts, went back to M.M.'s room, said he was sorry for snapping at her, and hugged M.M. from behind while she was naked. M.M. could feel McShurley's "private parts touching [her] back/butt area" and noticed that "[i]t was hard." Id. at 46.

On June 12, 2011, M.M. sat down on the couch and had her knees "kind of against [her] chest and [McShurley] came and put his hand up [her] shirt." Id. at 47. She told him not to tickle her, and he said that he was not going to tickle her. She asked him what he was doing, but he did not respond verbally. Rather, he put his hand up her shirt, felt her breasts, and rubbed around the nipple area and then squeezed "a little bit." Id. at 48. He then moved his hand down to her private area and rested his hand above her pants. M.M. went to the bathroom and returned thirty minutes later. She asked McShurley if he could sit up so that she could sit down, and then he pulled her on him which made her uncomfortable.

M.M. took the laptop computer and went upstairs. She searched for "what should you do if your dad is inappropriately touching you." Id. at 49. M.M. then cleared the history on the computer because she did not want her mother to "be the first one to find out." Id.

At some point, McShurley asked M.M. if she wanted to sleep in a tent with him outside, which made her feel uncomfortable, and she told herself that she needed to go and tell someone. Later that day, she texted Carol Houston, the mother of her best friend. Houston told M.M. to call her, and M.M. called Houston later in the day. M.M. was

upset and told Houston that she needed to talk to someone right away and that she did not want to talk to anybody in her family, and Houston told M.M. that she could come over to her house. M.M. arrived at Houston's house and was "crying a lot," "crying very hard," and was "close to hysterical" and "very nervous." Id. at 18-19. M.M. told Houston what was happening between her and McShurley, and Houston decided that she needed to talk to M.M.'s mother as soon as possible, but M.M.'s mother was out of town. M.M. stayed the night at Houston's house.

Dawn Gross, the chief investigator with the Tippecanoe County Prosecutor's office, interviewed M.M. for fifty minutes at the Hartford House. Lafayette City Police Detective Jeff Rooze asked M.M.'s mother to bring the computer in to the police. The day following the interview, Detective Rooze and Detective Mark Pinkard went to McShurley's house to discuss the incident with him and asked if he would come down to their office to do so. McShurley agreed to come and speak with the detectives and went to the police department that day. Detective Galloway reviewed an advice of rights form with him, and McShurley waived his rights. He spoke with detectives, and at some point stated: "I want to talk to a lawyer first." State's Exhibit 23 at 27:27-27:30.

On September 1, 2011, the State charged McShurley with four counts of child molesting as class C felonies related to his actions with M.M. On March 21, 2012, the State filed a motion to add Count V, sexual misconduct with a minor for McShurley's alleged actions with another child, and the court later granted the motion. At some point, McShurley filed a motion to sever Count V from the original four counts.[1] On April 25,

---

[1] The record does not contain a copy of McShurley's motion to sever.

2012, the court granted McShurley's motion to sever. On May 10, 2012, the jury found McShurley not guilty of Count V.

On December 4, 2012, a jury trial began for the four counts of child molesting related to M.M. During opening statement, defense counsel stated: "Now these charges were filed against Mike September 1st. He has been called in to the Lafayette Police Department. At that time I wasn't his attorney but I discussed it with him and advised him to stay out there [sic]. He did anyway, he wanted to talk to him." Id. at 7-8. During cross-examination, defense counsel questioned Detective Scott Galloway who indicated that McShurley went and spoke with him at Detective Galloway's request.

M.M. and Houston testified to the foregoing facts. Sean Leshney, the chief digital forensics investigator for the prosecutor's office, testified that he retrieved images of searches from McShurley's laptop, and the images displayed the following searches: "What do you do if your dad touches you wrong," "What do you do if your dad keeps touching you," and "what do you do if your dad KEEPS touching you wrongly." State's Exhibits 11, 12, 17.

During the direct examination of Detective Rooze, the video of the interview of McShurley was played for the jury, and defense counsel asked if the video could be stopped at a certain point. Defense counsel stated: "At this point if I am hearing this correctly he said that I want to talk to a lawyer. I don't want to say anymore." Transcript at 174. The prosecutor stated: "Right I understand the questioning has talked and the defendant continues to talk I don't think that violates the rights for him to voluntarily continue." Id. The court stated:

5

I respect your response [prosecutor] I heard an indication of counsel I understand the constitution of law and after the indication of counsel made the detective then begins to continue to talk after that. I regard that as indication of counsel, if counsel for defense is raising that as a constitutional offense I am upholding that.

Id. at 174-175. The prosecutor continued with direct examination, and Detective Rooze stated that after the statement he walked McShurley outside and that McShurley continued to talk to him outside with respect to "[j]ust chit chat about walking outside." Id. at 175. On cross-examination, Detective Rooze testified that McShurley spoke to him voluntarily, that he drove to the police station himself, that he could have "gotten up at any point – or could have refused to talk to [him] at all." Id. at 177. When asked, "So everything he did when he was cooperating with you full – 100%," Detective Rooze answered: "Yes." Id.

McShurley testified that his family has always been "a huggy, kissy sort of family." Id. at 276. He also testified that "[w]ith M.M. starting to just an infant just to help her get to sleep she liked to have her fact [sic] caressed and her stomach caressed and there were times even up until just a few days before the incident she said that she had a stomach ache and she asked me to come and rub her belly just to make her stomach feel better." Id. McShurley denied ever intentionally putting his hand in her underwear to fondle M.M.'s vagina. McShurley also indicated that he did not touch M.M. with even the remotest thought of sexual gratification. When asked why he hugged M.M. when she was nude after her shower, McShurley answered: "I didn't even think about it I just gave my daughter a hug and then I left." Id. at 279. On cross-examination, when asked whether he recalled touching M.M. on the upper thighs while she was just wearing her

panties, McShurley stated: "Yeah when we – when I would be tickling her." Id. at 282. McShurley admitted to placing his hand on M.M.'s thigh when driving her around but denied putting his hand on the interior part of her thigh against her crotch. On redirect examination, McShurley indicated that he voluntarily went to the police station and signed an agreement to testify or tell the police whatever they wanted to know.

McShurley later testified that M.M. was prescribed Zoloft. Dennis Dewey, a pharmacist, also testified for the defense. Specifically, Dewey testified that Zoloft is used in low doses for children, that 50 or 75 milligrams is not a low dose, that side effects could include agitation, hostility, hallucinations, and that it could have an effect on perception.

During closing argument, defense counsel stated that he was "not going to go through as [the prosecutor] did all of the witnesses and everything and show pictures and do all of that because you guys probably have a better perception of what the evidence – actually better than we do." Id. at 358-359. Defense counsel mentioned McShurley's background, his cooperation with police, and M.M.'s psychiatric treatment. During rebuttal closing argument, the prosecutor commented on defense counsel's arguments and made some statements regarding defense counsel.

On December 6, 2012, the jury found McShurley not guilty of Count I and guilty of Counts II, III, and IV. The court found McShurley's position of care, custody, and control of M.M. as an aggravator. The court found McShurley's lack of criminal history, military service, and employment history as mitigators. The court also recognized the "extreme mental and emotional harm to both the victim, and the family." Id. at 442. The

court found that the aggravators outweighed the mitigators. On January 18, 2013, the court sentenced McShurley to six years for each offense and ordered that Counts II and IV be served concurrent with each other and that Count III run consecutive to Counts II and IV for an aggregate sentence of twelve years. The court also ordered that McShurley serve ten years at the Department of Correction with two years on supervised probation.

DISCUSSION

I.

The first issue is whether the prosecutor committed prosecutorial misconduct that resulted in fundamental error. In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she should not have been subjected. Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006). Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. Id. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. Id.

When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. Id. If the party is not satisfied with the admonishment, then he or she should move for mistrial. Id. Failure to request an admonishment or to move for mistrial results in waiver. Id. McShurley concedes that no objection was made.

Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard for review is different from that of a properly preserved claim. Id. More specifically, the defendant must establish not only the grounds for the misconduct, but also the additional grounds for fundamental error. Id. Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. Id. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." Id.

McShurley argues that the prosecutor improperly vouched for the testimony of Gross by stating that she was telling the truth and that the prosecutor then "followed that up with statements about her testimony, and fitting [M.M.'s] action into them, including delayed disclosure and appearing as though everything was okay." Appellant's Brief at 11. McShurley contends that "[t]his created the appearance that because the investigator was being honest, and the investigator's testimony corroborated [M.M.'s] actions, that [M.M.] was also being honest." Id.

Specifically, McShurley points to the following statement made by the prosecutor during closing argument: "You heard Dawn Gross who has been an investigator with the Prosecutor's Office for 28 years she was honest with you when she was up here." Transcript at 343-344. However, the prosecutor's other comments provide context for this statement as the prosecutor commented:

> What anxiety has [M.M.] been feeling since this increase [in the dosage of her medication] that was testified to. Charges being filed against her dad, having to talk about being molested all of the time, having to give depositions, come to talk to a group of strangers about the molestation.

9

> Imagine a 13 year old telling a group of strangers about what happened to her. You heard Dawn Gross who has been an investigator with the Prosecutor's Office for 28 years she was honest with you when she was up here. She said I'm nervous I don't like talking in front of people. Imagine a 13 [year-old] in here testifying and talking to you about these things.

Id. We note that at trial, Gross made the following statement in the middle of one of her answers to a question: "I'm nervous I'm sorry. I don't like to talk in front of people." Transcript at 132. We cannot say that the prosecutor's reference to this statement and discussion of the testimony of Gross and M.M. placed McShurley in a position of grave peril to which he should not have been subjected or made a fair trial impossible.

McShurley also contends that statements made by the prosecutor during the rebuttal closing argument directly commented on McShurley's request to speak to an attorney and constituted a violation of the rule set forth in Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240 (1976), disparaged defense counsel on multiple occasions, and personally commented on the testimony of Dewey, the pharmacist. The State argues that "[t]here was no *Doyle* violation here and no prosecutorial misconduct here because the prosecutor was simply trying to rebut Defendant's claim of 'full-100%' cooperation with police." Appellee's Brief at 9. The State contends that McShurley stopped cooperating at some point and that this is a very different picture than the one of complete cooperation he was offering. The State argues that "[b]ecause the State was simply countering a defense rather explicitly offered by [McShurley], there was no misconduct in referencing [McShurley's] request for an attorney when speaking with police." Id. at 9-10. The State's position is that no error, fundamental or otherwise, was committed. The State also argues that the prosecutor "did not disparage defense counsel improperly, but rather

10

corrected some misstatements made by counsel and reigned in some of counsel's over-reaching arguments." Id. at 11.

Before addressing the prosecutor's comments, we observe that during closing argument defense counsel mentioned McShurley's background and that he went to high school and college, joined the Air Force, served his country for ten years, raised an autistic child, and was a loving father. Defense counsel also emphasized McShurley's cooperation with the police when he stated:

> You've got two cops banging back and forth he didn't have a chance to answer half the time and it's brought up he didn't deny it. He didn't say that it was disgusting. That's not true. Two things you want to keep in mind. Well three things about that interview. One they went to his house and talked to him. We don't have a tape of that. We don't know what he said. They went down to the station, he went voluntarily. Keep in mind he had not been charged, he had not been arrested, he did not know what the accusations were. The police came out and said hey but there are accusations against you by your daughter let's talk about it. He didn't know there were all of these different things that were going on.

Transcript at 363.

Defense counsel also stated:

> You heard the – and it's my fault I guess you heard a portion of that taped interview and some point he said I think – he's waking up, he's in trouble in here. What's going on I think I am getting accused of some pretty horrific things. He said I think I better talk to a lawyer. The judge stopped the tape at that time. That's proper. And if you noticed when he was stopping it and after he said I want a lawyer, [Detective Rooze] didn't stop questioning he was going yea okay and started asking other questions. That's when I objected. We don't know how long that interview went on afterwards because those two police officers were beating on him mentally and they're going to get all they can out of him. At some point it ended and they let him know or I don't know they may have put the cuffs on him right there but you didn't hear it all and you didn't hear any of the interview at home so there are a lot of unanswered questions there but the one thing that we do know he could have at that time said you know my daughter has been under psychiatric treatment.

11

Maybe you think he's an idiot for a father that he goes too far I can particularly remember my kids there came a point where my son would turn inside out if I walked in the bathroom and he was in there and I didn't realize it that it was at that stage and he did and I realized he was uncomfortable so I quit doing it. (Inaudible) spanked his butt and (inaudible) I didn't think much about it so that's where we are at.

Id. at 365-367. Defense counsel also commented on M.M.'s alleged mental issues and

the testimony of Dewey, the pharmacist, by stating:

But we do know and you know we don't really know the extent of her problems. We know that Mr. Dew[e]y – I guess he's not a doctor what you call him a pharmacist but Dennis Dew[e]y said you just don't put a child on – you don't normally put a child on Zoloft and you – what's heavy dosage well (inaudible) she's on 75 there's some problems there. Not her fault that's for sure but it would be an explanation for some of her thoughts and her processes.

Id. at 367-368.

During rebuttal closing argument, the prosecutor stated:

[Defense counsel] decided to spend a lot of time not talking about the facts of the case. I thought that was predictable, talking about the defendant's past that he raises his own son, he has a job, he's a member of the community, what does that have to do with anything? I would say fifty percent if not more of the conversation up here of what [defense counsel] said had absolutely nothing to do with the allegations and the facts of the case.

*****

[Defense counsel] keeps bringing up his kids and his sons and you know . . . there are times when they go in the bathroom so let's differentiate that here. We're talking about the dad going in with a young girl with an erection and hugging her. I think it's a little different then [sic] what [defense counsel] is talking about and to act like those are the same things are a little offensive.

*****

12

And then [defense counsel] wants to get up here and start making up facts. Maybe they badgered him, maybe they arrested him. That's completely made up. You heard what happened. He said well I want to talk to an attorney and Detective [Rooze] said Michael I am just telling you and he made a statement to him. You don't know what the rest of that statement was. It didn't start with a question. It wasn't a question. These detectives have been doing this a long time. He didn't continue to question him. He made a comment and then you don't know what the conversation was after that because [defense counsel] didn't want you to hear it. And hen [sic] what happened? Detective [Rooze] told you what happened. I walked him outside and we made small talk and he left and went home. [Defense counsel] is trying to blow this way out of proportion that two people are attacking him, and badgering him and throwing him in handcuffs and you don't know what happened after that video turned off. Yes you do, they told you what happened. If something happened and he was abused and he was mistreated you would have heard about it. Who testified? The defendant. He just told you. [Defense counsel] just apparently – I don't know if he wasn't just paying attention or what but that is clearly not what happened.

\* \* \* \* \*

There is no evidence about that trying to make her out like she's some crazy kid. There has been no evidence of that and then the testimony of the pharmacist you have to remember why he's here to testify about. He's here to testify about what the drug is and the side effects of the drug potentially. That fifty milligrams that's a high dosage but he's never dealt with this child. I think the doctor who has been prescribing her – her family doctor has been prescribing her Zoloft for that long I think knows a little better than a hypothetical situation from the pharmacist of how much Zoloft she should be on. I don't know [defense counsel] if you misspoke but brought up Prozac I don't know if there is any evidence of that I don't know misspoke [sic] but it's Zoloft and that's what she has been on and that's what her family doctor has prescribed for her.

Id. at 372-377.

With respect to McShurley's argument regarding Doyle, we observe that in Doyle,

the United States Supreme Court held, "the use for impeachment purposes of petitioners'

silence, at the time of arrest and after receiving Miranda warnings, violated the Due

13

Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S. Ct. at 2245. The Court explained, "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." Id. at 618, 96 S. Ct. at 2245. Silence does not mean only muteness; it includes the statement of a desire to remain silent as well as a desire to remain silent until an attorney has been consulted. Kubsch v. State, 784 N.E.2d 905, 914 (Ind. 2003) (citing Wainwright v. Greenfield, 474 U.S. 284, 295 n.13, 106 S. Ct. 634 (1986)). "Further, Doyle is not limited solely to 'the use for impeachment purposes' of a defendant's silence." Id. (quoting Wainwright, 474 U.S. at 292, 106 S. Ct. 634). Rather, it also applies to the use of a defendant's silence as affirmative proof in the State's case in chief. Id. (citing Wainwright, 474 U.S. at 292, 106 S. Ct. 634). Although evidence of a defendant's post-Miranda silence is generally not admissible, the defendant may open the door to its admission. Wentz v. State, 766 N.E.2d 351, 362 (Ind. 2002), reh'g denied. One example of that opening is when a defendant testifies on direct examination that he cooperated fully with the police. Id.

To the extent that the prosecutor stated: "[Detective Rooze] made a comment and then you don't know what the conversation was after that because [defense counsel] didn't want you to hear it," Transcript at 374, and made other statements regarding the end of the interview, we conclude that McShurley opened the door by raising the issue of his cooperation with police. We cannot say that these statements constitute commentary about McShurley's right to remain silent or that such statements resulted in fundamental error.

14

With respect to the other comments, we observe that the jury received instructions that statements made by the attorneys were not evidence, that the attorneys are permitted to characterize the evidence, that the jury had the right to determine both the law and the facts, and that the verdict should be based on the law and the facts as the jury finds them. Under the circumstances, we cannot say that McShurley has demonstrated that any prosecutorial misconduct resulted in fundamental error.

## II.

The next issue is whether McShurley's sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

McShurley argues that the imposition of consecutive sentences was not warranted. He points out that he has no prior criminal history, served the country honorably in the United States Air Force, and has a solid work history. He also argues that there is no indication that threats or violence were involved and that "the specifics of the offenses McShurley was convicted of are not more egregious than that contemplated by the legislature in determining an appropriate advisory sentence." Appellant's Brief at 17.

The State asserts that McShurley presents various cases where sentences have been reduced and concludes his argument with a litany of mitigating factors. The State

argues that "[t]his is not applying the nature of the offense and character of the offender analysis necessary for a claim of an inappropriate sentence," and that this failure should result in a waiver of this argument. Appellee's Brief at 15. The State also contends that McShurley's sentence is not inappropriate given McShurley's position of trust, his response to the allegations of challenging M.M.'s mental and emotional health, and the impact on the victim.

To the extent that McShurley raises an issue under Ind. Appellate Rule 7(B), we will address the merits of his argument. Our review of the nature of the offense reveals that McShurley adopted M.M. and that she referred to him as her dad. Between April 1, 2011, and early June 2011, M.M. was watching a movie with McShurley when he started rubbing her stomach and then "started going under [her] underwear and he just kept going like deeper and deeper in . . . ." Transcript at 44. McShurley rubbed M.M. for three or four minutes. M.M.'s stepbrother then walked in the room, and McShurley quickly took his hand and placed it on M.M.'s stomach but then eventually placed his hand under her pants but over her underwear. In early June 2011, McShurley who was wearing only shorts went to M.M.'s room and hugged her from behind while she was naked. M.M. could feel McShurley's "private parts touching [her] back/butt area" and noticed that "[i]t was hard." Id. at 46.

On June 12, 2011, M.M. sat down on the couch and had her knees "kind of against [her] chest and [McShurley] came and put his hand up [her] shirt." Id. at 47. She told him not to tickle her, and McShurley said that he was not going to tickle her. She asked him what he was doing, but he did not respond verbally. Rather, he put his hand up her

shirt, felt her breasts, and rubbed around the nipple area and then squeezed "a little bit." Id. at 48. He then moved his hand down to her private area and rested his hand above her pants.

Our review of the character of the offender reveals that McShurley served in the United States Air Force for ten years and was honorably discharged. The record contains eleven letters of support for him. He has no criminal history. At sentencing, McShurley stated:

> I've had 43 days to think about the trial and where I can see that being overly affectionate the things that were discussed during the trial could construe to lead the jury to a guilty verdict and I still maintain that there was no sexual thoughts or feelings on my behalf, on my part whatsoever. It just wasn't part of it. They said guilty. At this moment I can't change that. I don't – for the high strung emotions that have been going on both sides, for the anxiety's [sic] on both sides, for those I apologize to my wife and my daughter – my children. That's about all I've got to say.

Id. at 395-396. McShurley also stated that his twenty-one year old son was autistic, high functioning, and employed part-time, but needed a full time caregiver. He also indicated that since his incarceration his parents had been caring for his son. When asked whether he felt that his parents were physically, emotionally, mentally, and financially able to care for his son, he answered: "It's getting tough." Id. at 398. On cross-examination, he stated that his son's mother wrote a letter for him and that she lives in Georgia. M.M.'s mother testified that McShurley's son does not need "24 7 care" and that he could live in a group home or an apartment with someone who checks on him occasionally. Id. at 421.

The probation officer who completed the presentence investigation report recommended consecutive sentences of six years for each conviction for an aggregate sentence of eighteen years with fifteen years executed and three years suspended to

probation. After due consideration of the trial court's decision, we cannot say that the sentence imposed by the trial court of an aggregate sentence of twelve years with two years suspended is inappropriate in light of the nature of the offense and the character of the offender.

For the foregoing reasons, we affirm McShurley's convictions and sentence for three counts of child molesting as class C felonies.

Affirmed.

NAJAM, J., and MATHIAS, J., concur.