


FILED

Mar 11 2024, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N T H E

# Court of Appeals of Indiana

Christopher S. Applegate,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

March 11, 2024

Court of Appeals Case No.
23A-CR-954

Appeal from the Clark Circuit Court

The Honorable Vickie L. Carmichael, Judge

Trial Court Cause No.
10C04-2007-F1-12

**Opinion by Judge Mathias**
Judges Tavitas and Weissmann concur.

**Mathias, Judge.**

[1] Christopher S. Applegate appeals his convictions for Level 3 felony armed robbery, Level 5 felony battery, Level 6 felony auto theft, and Class A misdemeanor criminal mischief. He also appeals his adjudication as a habitual offender. On appeal, Applegate raises four issues for our review, which we restate as follows:

> 1. Whether the trial court erred when it permitted two law enforcement officers to testify to out-of-court statements made to them by Applegate's girlfriend.

> 2. Whether Applegate failed to preserve for appellate review his assertion that the trial court erred when it permitted a law enforcement officer to testify to out-of-court statements made to him by Applegate.

> 3. Whether the State presented sufficient evidence to support Applegate's conviction for Level 6 felony auto theft of a Dodge Nitro.

> 4. Whether the trial court erred when it had the jury determine the facts underlying the habitual offender allegation but reserved for itself the determination of whether Applegate was a habitual offender based on those facts.

[2] We affirm.

## Facts and Procedural History

[3] In July 2020, Applegate was dating Tiffany Cox. The morning of July 13, Applegate drove a Dodge Nitro along Upper River Road in Clark County. Cox

was in the passenger seat at the time. The two got into an apparent argument, and Applegate, who had a handgun with him, shot Cox in the right leg and then exited the vehicle.

[4] When Applegate exited the vehicle, Cox moved into the driver's seat, put the vehicle into reverse, and backed the vehicle into a wooded area. The vehicle became stuck there. At that point, Cox exited the vehicle and ran down a nearby gravel driveway.

[5] Soon after, she ran in front of a pickup truck being driven by Bonnie Cummings. Cox was "wav[ing] her hands" and "jumped . . . in front" of Cummings's truck as Cummings attempted to navigate around her. Tr. Vol. 2, p. 246. Cox attempted to get into the passenger's side seat of the truck, but Cummings had filled that space with coolers. Cox then "jumped into the bed" of the truck and "said go, go." *Id.* at 247. As Cummings was "processing what's going on," she saw Applegate running at her from the same driveway Cox had run down. *Id.* Applegate then jumped into the back of the truck with Cox. The two struggled there. Cox managed to get out of the back of the truck, forced herself in the front passenger seat, and told Cummings to "go, go, go, he'll kill me, he'll kill us both." *Id.* at 248. Cummings then saw Applegate get out of the bed of the truck, and she "heard a shot." *Id.* at 249. Cummings "put the truck [in] gear and pressed the [gas pedal] down and . . . got out of there." *Id.*

[6] Meanwhile, Emma Sternberg was driving her Volkswagen Tiguan down Upper River Road and came up behind Cummings's stopped truck. She observed

Applegate and Cox struggling in the back of the truck. She then saw Applegate jump out of the back of the truck and the truck "t[ake] off" down the road. Tr. Vol. 3, p. 21. Applegate approached Sternberg and pointed his gun at her. Applegate yelled at her to exit the Volkswagen. As Sternberg attempted to comply, Applegate fired his gun at her driver's side window. The bullet went through the window but did not hit Sternberg, who immediately exited the vehicle. Applegate then took Sternberg's Volkswagen and pursued Cummings and Cox. However, some ways down the road, Applegate crashed the Volkswagen, causing significant damage to it.

[7] Cummings and Cox eventually drove to Cox's father's house. Cox exited the vehicle and yelled, "daddy, daddy, he shot me," and Cummings called 9-1-1. *Id.* at 7. Clark County Sheriff's Department Officers Larry Pavey and Charlie Scott responded to Cummings's 9-1-1 call. When they arrived, they observed Cox's gunshot wound. Officer Pavey observed that Cox "had quite a bit of blood on her and she was physically shaking." Tr. Vol. 2, p. 47. Cox was also "crying really bad." *Id.* at 48. Officer Scott likewise observed that Cox was "[p]anicked, very much in a traumatic state, she was crying, visibly upset, visibly injured, a lot of yelling and screaming." *Id.* at 69. Cox told Officer Pavey that her boyfriend was "trying to kill me," and she told Officer Scott that "Chris Applegate" was the person who had "shot" her. *Id.* at 49, 69. Officer Pavey concluded there was "a shooter on the loose," which he considered "an emergency situation." *Id.* at 50.

[8] While Officer Pavey was at Cox's father's house, he received a report from dispatch that Applegate may be nearby. Officer Pavey went to the reported area and located Applegate. Officer Pavey placed Applegate in handcuffs, read him his *Miranda* rights, and asked him if he wanted to talk. Applegate said "no," he did not want to talk. *Id.* at 55. Officer Pavey could tell that Applegate had been injured, and he told Applegate that paramedics would be there soon. Officer Pavey then asked Applegate, "are you hurt in any shape or form?" *Id.* at 55-56. Applegate responded that his "knees hurt" and that he thought he had "some loose teeth." *Id.* at 56. Officer Pavey asked, "how did you obtain that injury?" *Id.* Applegate responded, "she hit me," and when Officer Pavey asked who had hit him, Applegate identified Cox and said she was mad at him "for fooling around." *Id.* at 57.

[9] Officer Scott later assisted with the investigation along Upper River Road, and he located the Dodge Nitro, which had been crashed but was still running. He observed that the vehicle had a Kentucky license plate. He searched the vehicle's registration number in an interstate database, and he learned that the vehicle was registered to a Yolanda Sims in Louisville, Kentucky, and that the vehicle had been reported stolen on July 7, 2020. Another officer investigating the Dodge Nitro, Detective August Vissing, located a driver's license, an Aetna card, a Capitol One credit card, and a Visa credit card inside the vehicle. Each of those four cards was in a different name, and none of the cards were in Applegate's or Cox's names.

[10]     The State charged Applegate with numerous offenses and also alleged him to be a habitual offender. Prior to the commencement of Applegate's jury trial, Cox died due to unrelated circumstances. At the first phase of the ensuing bifurcated jury trial, the court permitted Officer Pavey and Officer Scott, over Applegate's objections, to testify to what Cox had said to them at her father's house on the day of the incidents. The court also permitted Officer Pavey to testify to what Applegate had said to the officer upon Applegate's arrest; Applegate did not object to this portion of Officer Pavey's testimony. And the court permitted Officer Scott to testify to his investigation of the Dodge Nitro's registration; however, after Applegate lodged a hearsay objection to Officer Scott's recitation of records he had observed, the court responded that it would permit Officer Scott's testimony solely for the purpose of understanding his investigation and not for the purpose of whether the statements he observed were "true or not." *Id.* at 76. The jury found Applegate guilty of Level 3 felony armed robbery (for stealing the Volkswagen), Level 5 felony battery (against Cox), Level 6 felony auto theft (of the Dodge Nitro), and Class A misdemeanor criminal mischief (for the damage done to the Volkswagen).

[11]     The court then held the second phase of the bifurcated jury trial to determine Applegate's status as a habitual offender. For this phase, the court asked the jury, without objection from Applegate, to find whether the alleged prior convictions underlying the habitual offender allegation were true. The court reserved for itself the determination of whether Applegate was a habitual offender based on the jury's findings. After the jury found the requisite prior

offenses to be true, the court adjudicated Applegate to be a habitual offender. The court then entered its judgment of conviction and sentenced Applegate accordingly.

This appeal ensued.

## 1. The trial court did not err when it permitted Officers Pavey and Scott to testify to Cox's statements to them at her father's house on the day of the incidents.

On appeal, Applegate first asserts that the trial court erred when it permitted Officers Pavey and Scott to testify to Cox's out-of-court statements to them. Applegate's argument on this issue is two-fold. He first asserts that the trial court violated his right to confront a witness against him, Cox, as guaranteed by the Sixth Amendment to the United States Constitution. He also asserts that the admission of her out-of-court statements was contrary to our Rules of Evidence. We address each argument in turn.

### 1.1. Cox's statements to the officers at her father's house were in response to an ongoing emergency, and, therefore, they were nontestimonial under the Sixth Amendment.

We first address Applegate's argument under the Sixth Amendment. We review a trial court's ruling on the constitutionality of evidentiary decisions under a standard "similar to other sufficiency issues"—that is, we consider only the evidence most favorable to the trial court's ruling, along with any uncontradicted evidence to the contrary, to decide whether the evidence is sufficient to support the ruling. *McIlquham v. State*, 10 N.E.3d 506, 511 (Ind.

2014). Of course, the ultimate determination of whether that evidence demonstrates a constitutional violation is a question of law that we review de novo. *See id.*

[15] The Sixth Amendment prohibits the admission of "testimonial" statements of a witness who does not appear at trial unless that witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Collins v. State,* 873 N.E.3d 149, 153 (Ind. Ct. App. 2007), *trans. denied.* As the Supreme Court of the United States has explained:

> [s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington,* 547 U.S. 813, 822 (2006). In applying that definition, we have looked to several factors, including:

> (1) whether the declarant was speaking about events as they were actually happening or describing past events; (2) whether the declarant was facing an ongoing emergency; (3) whether the nature of the questions asked by law enforcement were such that they elicited statements necessary to resolve the present emergency rather than simply to learn about past events; and (4) the level of formality of the interrogation.

*Gayden v. State,* 863 N.E.2d 1193, 1197 (Ind. Ct. App. 2007), *trans. denied.*

Here, the evidence most favorable to the trial court's ruling demonstrates that Cox's statements to the officers at her father's house were nontestimonial. Cox's statements were about events as they were actually happening. She, and the community, were facing what Officer Pavey expressly identified in his testimony as an "emergency situation"—Cox was suffering a loss of significant blood from her gunshot wound, and the community was facing a shooter-at-large. Tr. Vol. 2, p. 50. Further, the officers did not elicit statements from Cox that were not essential to meeting either her emergency or the community's, and there was nothing formal about how the officers engaged Cox on her father's porch while they were awaiting emergency medical personnel to arrive. Cf. *Collins*, 873 N.E.2d at 155-56 (holding that a declarant's statements to a 9-1-1 operator regarding a recent shooting were for the primary purpose of enabling police to meet an ongoing emergency and therefore nontestimonial). Accordingly, the admission of Cox's statements to the officers did not violate Applegate's Sixth Amendment rights.

### 1.2. Cox's statements to the officers at her father's house were excited utterances, and, thus, they were admissible as an exception to the prohibition against hearsay.

Applegate also asserts that Cox's statements to the officers were inadmissible hearsay. A trial court has broad discretion regarding the admission of evidence, and its decisions are reviewed only for abuse of discretion. *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021). We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it and the errors affect a party's substantial rights. *Id.*

[18] Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay is generally inadmissible. *See* Evid. R. 802. However, Evidence Rule 803(2) provides that hearsay may be admissible if the statement is an excited utterance, which is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Such statements are "deemed reliable" because of their "spontaneity and lack of thoughtful reflection and deliberation." *Fowler v. State*, 829 N.E.2d 459, 463 (Ind. 2005).

[19] We have little trouble concluding that Cox's statements to the officers were excited utterances. At the time Cox made her statements to the officers at her father's house, she "had quite a bit of blood on her and she was physically shaking." Tr. Vol. 2, p. 47. She was "crying really bad," and she was "[p]anicked, very much in a traumatic state, . . . visibly upset, visibly injured, [and there was] a lot of yelling and screaming." *Id.* at 48, 69. In other words, the logic and effect of the facts and circumstances before the trial court demonstrates that Cox was "under the stress of [the] excitement" about which her statements were made. Evid. R. 803(2).

[20] Still, Applegate asserts that Cox could have thoughtfully reflected on matters. He even goes so far as to state that "[t]here was no extreme and continuing stress in this case." Appellant's Br. at 12. But Applegate's assertions are not supported by the record, and we reject them. The trial court did not abuse its discretion when it permitted the officers to testify to Cox's out-of-court statements to them.

## 2. Applegate did not preserve his argument under the Fifth Amendment for appellate review.

Applegate next contends that the trial court violated his Fifth Amendment right to remain silent when it permitted Officer Pavey to testify to Applegate's out-of-court statements upon his arrest. Specifically, Applegate asserts that his rights were violated when Officer Pavey continued to ask him questions—to which Applegate provided incriminating responses—after Applegate had told Officer Pavey "no," he did not want to talk. Tr. Vol. 2, p. 55. As our Supreme Court has noted: "When a person 'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *Washington v. State*, 808 N.E.2d 617, 623 (Ind. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)).

However, Applegate did not contemporaneously object to Officer Pavey's testimony on this issue in the trial court. Accordingly, he has not preserved the issue for appellate review. *E.g.*, *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018). As our Supreme Court has explained, the contemporaneous-objection rule is "designed to promote fairness by preventing a party from sitting idly by." *Id.* (quotation marks omitted). The rule also "gives the [trial] court an opportunity to cure the alleged error, which, in turn, can result in enormous savings in time, effort and expense to the parties and the court" while giving the court on appeal the benefit of "a sufficiently-developed record on which to base its decision." *Id.* (quotation marks omitted).

[23] Further, after the State here asserted in its responsive brief that Applegate had forfeited this issue, Applegate argued for the first time in his Reply Brief that we should review this issue for fundamental error. "An error is fundamental, and thus reviewable on appeal, if it made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." *Id.* at 652. But fundamental error

> is extremely narrow and encompasses only errors so blatant that the trial judge should have acted independently to correct the situation. At the same time, if the judge could recognize a viable reason why an effective attorney might not object, the error is not blatant enough to constitute fundamental error.

*Id.* (quotation marks and citations omitted).

[24] Because Applegate did not argue fundamental error until his Reply Brief, he has waived appellate review of his Fifth Amendment argument under that doctrine. It is well established that a party may not present an argument for the first time in a Reply Brief. *E.g.*, *Town of Zionsville v. Town of Whitestown*, 49 N.E.3d 91, 100 (Ind. 2016). Indeed, our Supreme Court has expressly recognized that not even fundamental error may be raised for the first time in a Reply Brief. *Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011) ("parties may not raise an issue, such as fundamental error, for the first time in a reply brief").

[25] And our conclusion that Applegate failed to preserve his Fifth Amendment argument is especially appropriate here. Even if we were to assume for the sake

of argument that Applegate's out-of-court statements to Officer Pavey should not have been admitted, error alone does not demonstrate reversible error. *See, e.g.*, *Hayko v. State*, 211 N.E.3d 483, 491-92 (Ind. 2023). It was Applegate's burden on appeal to demonstrate how this alleged error made a fair trial impossible on this record. *See, e.g.*, *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). He has not done so, and it is not appropriate for this Court to make that argument on his behalf. *E.g.*, *Rodts v. Heart City Auto., Inc.*, 933 N.E.2d 548, 554 (Ind. Ct. App. 2010) ("We will not become a party's advocate, and the failure to put forth a cogent argument acts as a waiver of the issue on appeal."); *see also* *Keller v. State*, 549 N.E.2d 372, 373 (Ind. 1980) (observing that a court runs the risk of being an advocate rather than an adjudicator when it searches the record and makes up its own arguments because a party presented them in a perfunctory manner).

[26]     Accordingly, we conclude that Applegate's argument under the Fifth Amendment is not properly before us, and we do not consider it.

## 3. The State presented sufficient evidence to support Applegate's conviction for Level 6 felony auto theft.

[27]     We next address Applegate's argument that the State failed to present sufficient evidence to support his conviction for Level 6 felony auto theft. For sufficiency of the evidence challenges, we consider only probative evidence and reasonable inferences that support the judgment of the trier of fact. *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021). We will neither reweigh the evidence nor judge witness credibility. *Id.* We will affirm a conviction unless no reasonable fact-finder

could find the elements of the crime proven beyond a reasonable doubt. *Id.* To prove that Applegate committed Level 6 felony auto theft, the State was required to show beyond a reasonable doubt that Applegate knowingly or intentionally exerted unauthorized control over a motor vehicle—the Dodge Nitro—of another person with the intent to deprive that person of the vehicle's value or use. Ind. Code § 35-43-4-2(a)(1)(B)(ii) (2020).

[28]    Much of the parties' dispute on this issue is whether Officer Scott's testimony regarding his investigation into the registration of the Dodge Nitro was admissible for the truth of the matter or for another purpose. We need not resolve this dispute; the trial court expressly said that Officer Scott's testimony here was admissible only to understand the course of his investigation and not for any truth of the matters asserted. In our review of the sufficiency of the substantive evidence, then, we accept the trial court's limit to Officer Scott's testimony.

[29]    The State argues in the alternative that the remaining evidence still permitted a reasonable fact-finder to conclude that Applegate committed Level 6 felony auto theft with respect to the Dodge Nitro, and we agree. The substantive evidence shows that Applegate drove the Dodge Nitro on Upper River Road in Clark County in the morning hours of July 13, 2020. The vehicle had a Kentucky license plate, but Applegate had an Indiana residential address. After Cox had crashed the vehicle and fled on foot, rather than attempting to recover the Dodge Nitro or even turn it off and collect the vehicle's key, Applegate instead chased Cox on foot himself. Then, when Cox escaped in Cummings's

truck, Applegate stole the Volkswagen. After he crashed that vehicle, Applegate again fled the scene, as he had done with the Dodge Nitro. Further, Detective Vissing later located a driver's license, an Aetna card, a Capitol One credit card, and a Visa credit card inside the vehicle, each of which was in a different name and none of which were in Applegate's or Cox's names.

[30]   We disagree with Applegate's assertion that that evidence merely establishes his possession of a vehicle that was not his. Rather, a reasonable fact-finder could have found from the totality of that substantive evidence that the State demonstrated the elements of Level 6 felony auto theft with respect to the Dodge Nitro. We therefore affirm his conviction for that offense.

## 4. The trial court's procedure in determining Applegate's status as a habitual offender is not contrary to a majority opinion of our Supreme Court in *Harris v. State*.

[31]   Last, Applegate argues that the trial court violated his right under Article 1, Section 19 of the Indiana Constitution to have the jury determine both the law and the facts of the State's habitual offender allegation. Again, during the second phase of Applegate's trial, the court asked the jury, without objection from Applegate, to find whether the alleged prior convictions underlying the habitual offender allegation were true. The court reserved for itself the determination of whether Applegate was a habitual offender based on the jury's findings. Thus, after the jury found the requisite prior offenses to be true, the court adjudicated Applegate to be a habitual offender.

[32] Applegate's argument on this issue rests on whether part I of the lead opinion in *Harris v. State*, 211 N.E.3d 929, 935-38 (Ind. 2023), which was decided while this direct appeal was pending, should apply to his habitual offender determination.[1] But that part of the lead opinion in *Harris* did not have the support of three of our five Justices. Only our Chief Justice concurred in part I of the lead opinion. *See id.* at 947 (Rush, C.J., concurring in part and dissenting in part). Justice Molter, joined by Justice Massa, joined only in other parts of the lead opinion. *See id.* at 943 (Molter, J., concurring in part and concurring in the judgment). And Justice Slaughter expressly refused to join part I of the lead opinion. *See id.* at 956 (Slaughter, J., dissenting) ("I do not join Part I").

[33] There is therefore no "holding" from part I of *Harris* to direct the trial court to apply here.[2] Accordingly, we affirm on this issue as well.

## Conclusion

[34] For all of the above-stated reasons, we affirm Applegate's convictions and habitual offender adjudication.

---

[1] The State responds that Applegate is attempting to apply a new rule of law, announced in *Harris*, retroactively to a case on collateral review. Appellee's Br. at 31-36. But this is a pending direct appeal, not a case on collateral review. We therefore do not consider the State's response. *Cf. Membres v. State*, 889 N.E.2d 265, 271-72 (Ind. 2008) (announcing tests to apply to determine whether a new rule of Indiana constitutional law should apply to a pending direct appeal).

[2] We emphasize that Applegate's argument on appeal is limited to applying part I of *Harris*. Appellant's Br. at 15-16. He does not argue that this Court should adopt the plurality opinion of part I, and we therefore do not consider that possibility. *See, e.g.*, *Keller*, 549 N.E.2d at 373; *Rodts*, 933 N.E.2d at 554 ("We will not become a party's advocate, and the failure to put forth a cogent argument acts as a waiver of the issue on appeal.").

[35]     Affirmed.

Tavitas, J., and Weissmann, J., concur.

ATTORNEY FOR APPELLANT

Christopher Sturgeon
Clark County Public Defender Office
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana